483 Pa. 539 (1979)
397 A.2d 1154
SPRINGFIELD SCHOOL DISTRICT, DELAWARE COUNTY, Pennsylvania, Appellant,
v.
DEPARTMENT OF EDUCATION, Commonwealth of Pennsylvania.
SCHOOL DISTRICT OF PITTSBURGH, Appellant,
v.
COMMONWEALTH of Pennsylvania, DEPARTMENT OF EDUCATION, Appellee,
and
Joseph Scott and Helen Scott, his wife, and Alphonse Greppi and Gloria Greppi, his wife, Intervenors,
and
Patrick Maietta and Kathy Maietta, his wife, David Slain and Betty Slain, his wife, Bernard Connor and Joanne Connor, his wife, Angelo Borelli and Patricia Borelli, his wife, and Paul Dongilli and Patricia Dongilli, his wife, Intervenors.
PEQUEA VALLEY SCHOOL DISTRICT, Appellant,
v.
COMMONWEALTH of Pennslyvania, DEPARTMENT OF EDUCATION, Appellee,
and
Fabio Pini and Patricia Pini, his wife, Allen Lefever and Doris Lefever, his wife, Christian G. Peiffer and Laverne Peiffer, his wife, and Mrs. Joseph Short, Intervenor-Appellees (two cases).
Supreme Court of Pennsylvania.
Argued October 19, 1978.
Decided January 24, 1979.
*540 *541 *542 *543 *544 Robert J. Stefanko, Sol., Persifor S. Oliver, Jr., Asst. Sol., Pittsburgh, for appellants.
Patricia A. Donovan, William B. Ball, Joseph G. Skelly, Philip J. Murren, Ball & Skelly, Harrisburg, for appellee.
Before EAGEN, C.J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

OPINION
NIX, Justice.
Appellant school districts are appealing from separate orders of the Commonwealth Court affirming decisions by the Secretary of Education finding the districts to be in violation of the Act of December 29, 1972, P.L. 1726, No. 372, amending § 1361 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, Art. XIII, as amended, 24 P.S. § 13-1361 (1978-79 Supp.) (Act 372). For the following reasons we now affirm the orders of the Commonwealth Court.
Act 372 authorizes local school districts to provide for the free transportation of pupils to public and nonpublic schools. It states in pertinent part:
The board of school directors in any school district may. . . provide for the free transportation of any resident pupil to and from the kindergarten, elementary school, or secondary school in which he is lawfully enrolled, provided that such school is not operated for profit and is located within the district boundaries or outside the district boundaries at a distance not exceeding ten miles by the nearest public highway, except that such ten-mile limit shall not apply to area vocational technical schools which regularly serve eligible district pupils or to special *545 schools and classes approved by the Department of Education,. . . When provision is made by a board of school directors for the transportation of public school pupils to and from such schools . . . the board of school directors shall also make identical provision for the free transportation of pupils who regularly attend nonpublic kindergarten, elementary and high schools not operated for profit to and from such schools . . . . Such transportation of pupils attending nonpublic schools shall be provided during regular school hours on such dates and periods that the nonpublic school not operated for profit is in regular session, according to the school calendar officially adopted by the directors of the same in accordance with provisions of law.
There are 505 school districts in Pennsylvania. Appellants are three of the five districts that have failed to comply with Act 372.[1] Pittsburgh and Pequea Valley have refused to transport nonpublic school students beyond the district boundaries. Springfield transports nonpublic school students beyond its district lines only to a distance of the three and one-quarter miles, which is approximately equal to the distance public school students are transported within the district's boundaries. On different dates in 1974, the Secretary of Education issued show cause orders to these three school districts requiring them to give reasons why funds due them on account of reimbursable pupil transportation expenses should not be withheld because of their failure to comply with Act 372. Following separate hearings, the Secretary of Education issued final orders in August and September, 1976, directing the school districts to transport all eligible nonpublic school children beyond the school district boundaries in accordance with the ten-mile maximum set forth in Act 372. The Secretary further directed that all transportation reimbursement funds paid by the Commonwealth to the school districts be withheld until there was compliance with the Act.
*546 On February 10, 1978, the Commonwealth Court affirmed in part the final order of the Secretary of Education regarding the Pittsburgh School District. School District of Pittsburgh v. Commonwealth of Pennsylvania, Department of Education, 33 Pa.Cmwlth. 535, 382 A.2d 772 (1978). The court affirmed that portion of the order requiring the transportation of eligible pupils beyond the district's boundaries, but vacated the portion of the order pertaining to the withholding of the reimbursement subsidy.[2] On the strength of that opinion, the Commonwealth Court similarly affirmed in part the orders by the Secretary of Education regarding Springfield and Pequea on April 21 and July 5, 1978, respectively. Springfield School District v. Commonwealth of Pennsylvania, Department of Education, 35 Pa. Cmwlth. 71, 384 A.2d 1049 (1978); Pequea Valley School District v. Commonwealth of Pennsylvania, Department of Education, 36 Pa.Cmwlth. 403, 387 A.2d 1022 (1978).
We took jurisdiction of the school districts' appeals pursuant to 42 Pa.C.S. § 724(a) (1978) and scheduled joint arguments. Appellants challenged the constitutionality of Act 372 under the first and fourteenth amendments to the federal constitution and under three provisions of our state constitution.

PART I

The Applicability of the Establishment Clause

A.
The school districts claim that Act 372 is unconstitutional under the establishment clause of the first amendment to the federal constitution because the Act is a "law respecting the establishment of religion." U.S.Const. amend. I. This clause was made applicable to the states in Cantwell v. Connecticut, 310 U.S. 296, 303-05, 60 S.Ct. 900, 903-04, 84 L.Ed. 1213, 1217-18 (1940).
*547 The United States Supreme Court has developed a three-part test to determine whether a particular state law violates the establishment clause. To pass constitutional muster, the statute under scrutiny must 1) reflect a clearly secular legislative purpose; 2) have a primary effect that neither advances nor inhibits religion; and 3) avoid excessive government entanglement with religion. Meek v. Pittenger, 421 U.S. 349, 358, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217, 227-28 (1975), and cases cited therein. All three of the test's requirements must be met before the act in question will be permitted to stand. Despite the seeming clarity of this test, commentators and members of the Supreme Court itself have alluded to the difficulties encountered in its application. Prof. Henry J. Abraham had occasion to refer to
. . . the difficulty, if not perhaps the utter impossibility, of creating and drawing a viable, predictable line between the permissible and the impermissible in the realm of the establishment clause in general and in that of the subsection of public and private education in particular. H. Abraham, Freedom and the Court, 279 (2d ed. 1972).
Justice Powell stated in Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973), that the cases arising under the establishment clause "have presented some of the most perplexing questions to come before this Court." Speaking for the Court in Walz v. Tax Commission of City of New York, 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701-02 (1970), Chief Justice Burger observed:
The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of [the religion clauses], which is to insure that no religion be sponsored or favored, none commanded, and none inhibited.
The Court in Meek assessed the strengths and weaknesses of the test as follows:
These tests constitute a convenient, accurate distillation of this Court's efforts over the past decades to evaluate a *548 wide range of governmental action challenged as violative of the constitutional prohibition against laws "respecting an establishment of religion," and thus provide the proper framework of analysis for the issues presented in the case before us. It is well to emphasize, however, that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired. Meek v. Pittenger, supra, 421 U.S. at 358-59, 95 S.Ct. at 1760 (citations omitted).
Before we proceed to analyze the instant statute in light of this test it is helpful to set forth the various objectives to which the establishment clause is addressed. In the first "modern" case involving the establishment clause, Everson v. Board of Education of Township of Ewing, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947),[3] Justice Black, writing for the five man majority, reviewed the history leading up to the adoption of the establishment clause and then set forth the following view as to its objective:
The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and State." 330 U.S. at 15-16, 67 S.Ct. at 511-512.
This "wall of separation" requires that governmental action must be neutral in its effect upon religion and religious *549 institutions. Thus in writing for the eight man majority in Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), Justice Clark explained:
The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the state is firmly committed to a position of neutrality. Id., 374 U.S. at 226, 83 S.Ct. at 1574.
This view was echoed by Chief Justice Burger in Walz v. Tax Commission of City of New York, supra. There he wrote:
The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference. 397 U.S. at 669, 90 S.Ct. at 1411-1412.
This concept of "benevolent neutrality" reflects a realization that the "wall of separation" does not require a degree of governmental detachment whereby the state becomes the adversary of religion or insensitive to its needs. As noted in Walz
Separation in this context cannot mean absence of all contact; the complexities of modern life inevitably produce some contact and the fire and police protection received by houses of religious worship are no more than incidental benefits accorded all persons or institutions within a State's boundaries, along with many other exempt organizations. Id. at 676, 90 S.Ct. at 1415.
*550 Thus governmental action is not necessarily proscribed because it results in a benefit to a religious institution, provided the benefit is indirect and incidental. E.g., Everson v. Board of Education, supra. Moreover, the determination as to whether a benefit is indirect and incidental is principally a question of degree.
Primary among the evils against which the Establishment Clause protects "have been `sponsorship, financial support, and active involvement of the sovereign in religious activity.' Walz v. Tax Comm'n, supra, 397 U.S. at 668, [90 S.Ct. 1409;] Lemon v. Kurtzman, supra, 403 U.S. at 612", [91 S.Ct. 2105.] Committee for Public Education & Religious Liberty v. Nyquist, supra, 413 U.S. at 772, [93 S.Ct. at 2965.] The Court has broadly stated that "[n]o tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they adopt to teach or practice religion." Everson v. Board of Education, 330 U.S. 1, 16, [67 S.Ct. 504, 511, 91 L.Ed. 711.] But it is clear that not all legislative programs that provide indirect or incidental benefit to a religious institution are prohibited by the Constitution. See Zorach v. Clauson, 343 U.S. 306, 312, [72 S.Ct. 679, 683, 96 L.Ed. 954;] Lemon v. Kurtzman, supra, 403 U.S. at 614, [91 S.Ct. at 2112.] "The problem, like many problems in constitutional law, is one of degree." Zorach v. Clauson, supra, 343 U.S. at 314, [72 S.Ct. at 684.] Meek v. Pittenger, supra, 421 U.S. at 359, 95 S.Ct. at 1760.

B.
Proceeding from these basic principles we must examine the instant legislation in light of the three prong test that has been provided. Our first consideration is whether the statute possesses a clearly secular legislative purpose. Act 372 was the product of legislative concern for the welfare of school children travelling between home and school. Protecting the child against the hazards of traffic, the exposure to inclement weather and the designs of persons who would harm them are well recognized secular governmental interests. *551 Providing bus transportation is obviously an appropriate means to accomplish these purposes. This Court has previously expressed the view that a legislative enactment providing for bus transportation for school children was a legitimate legislative action to respond to a real danger. Rhoades v. Abington Township School Dist., 424 Pa. 202, 226 A.2d 53, cert. denied, 389 U.S. 846, 88 S.Ct. 36, 19 L.Ed.2d 114, appeal dismissed, 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1967).
In view of the peril hovering over our streets and roads like a miasmatic fog, those charged with concern for the safety of children are duty bound to devise methods and means for saving the little travelers from harm on their way to and from school. Obviously the manner in which to provide these youthful wayfarers with a fair measure of protection against highway mishap is to keep them pedally off the roads and to transport them in vehicles so formidably constructed that they may ward off and parry, to the maximum extent possible, aggression from other vehicles. The school bus with its large heavy wheels and steel fabricated body seems to be the answer to the worrisome problem. Pennsylvania Secretary of Public Welfare, in testifying on House Bill 381 (later to become Act 91) before the Senate Education Committee, said: ". . . school bus transportation clearly involves the safety and health of our children. The busing of school children is for their protection against hazards of the roadways and of traffic, against dangers occasioned by exposure to weather, against evils of child molestation." Rhoades v. Abington Township School Dist., supra at 206-07, 226 A.2d at 57 (footnote omitted).
We are still of the view expressed in Rhoades and are satisfied that the current amendment does not in any way reflect upon this aspect of the analysis.[4] We note that the *552 appellants have declined to challenge the constitutionality of the Act upon this ground and thus we need not be detained further as to this aspect of the analysis.

C.
The second prong of the test presents a more difficult problem. Does Act 372 have a primary effect that neither advances nor inhibits religion? We are satisfied that under the reasoning of the United States Supreme Court decisions in this area this statute does not have the proscribed primary effect.
The appellees and to a large extent the Commonwealth Court, found that this issue was controlled by the United States Supreme Court's Everson opinion[5] and the opinion of *553 this Court in Rhoades v. Abington Township School District, supra. Regrettably the resolution of this issue is not that simple. After Everson and Rhoades were decided, the United States Supreme Court has been required to discuss the considerations underlying the second prong of the test on a number of occasions. To the extent these subsequent decisions have refined the Everson holding, we are required to examine the instant Act accordingly.
In Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Supreme Court was faced with a statute quite like Act 372 insofar as it provided that nonpublic school students should be transported at public expense during field trips for secular educational purposes.[6] At first blush, the Wolman field trips, would, like the Everson bus program seem to fall within that category of state aid that does not impermissibly aid religion. The United States Supreme Court looked farther into the case than the fact that both Everson and Wolman involved bus transportation of nonpublic school students. The Court in Wolman pointed out that:
. . . although a trip may be to a location that would be of interest to those in public schools, it is the individual teacher who makes a field trip meaningful. The experience begins with the study and discussion of the place to *554 be visited; it continues on location with the teacher pointing out items of interest and stimulating the imagination; and it ends with a discussion of the experience. The field trips are an integral part of the educational experience, and where the teacher works within and for a sectarian institution, an unacceptable risk of fostering of religion is an inevitable by-product. 433 U.S. at 253-54, 97 S.Ct. at 2608 (citation omitted).
The teaching of Wolman is that Everson did not provide a blanket approval for all types of school bus programs. It is therefore apparent that we must look beyond the superficial similarity to ascertain the constitutionality of the legislation. It is presently urged that the instant legislation is defective in three respects. Appellants first claim that Act 372 in actual operation results in preferential benefits being accorded to nonpublic school students which are not given equally to public school students. Second, that the dominant beneficiaries of this Act are students attending religious schools, primarily Catholic schools, making the Act unconstitutional. Third, that the indirect effect theory of Everson is fallacious. These claims will be discussed seriatim.

1.
Appellants advance the proposition that the establishment clause and United States Supreme Court rulings mandate that when the "benevolently neutral" state accords nonpublic schools and their pupils incidental benefits, these benefits must not be more extensive than the same benefits accorded public school students. The school districts point to language in Everson, for example, that the establishment clause "requires the state to be a neutral in its relations with" religion, and that the state's power is not to be used to "favor" religion or religious groups. Everson v. Board of Education, supra, 330 U.S. at 18, 67 S.Ct. 504. The school districts proceed to reason that they need not transport nonpublic school students out of the district. Pequea Valley School District poses and answers the following question:

*555 Can the State be said to have maintained its neutrality and not to have bestowed a favor upon sectarian institutions by virtue of the mandates of Act 372? Considering the irregular and unusual treatment conferred upon parochial school students by Act 372, the answer is obviously, "no."
Brief for Pequea Valley School District, Appellant, at 16 (emphasis in the original).
The Pittsburgh School District points out that Everson upheld the bus fare program so as not to "inadvertently prohibit New Jersey from extending its general State law benefits to all its citizens . . . ." 330 U.S. at 16, 67 S.Ct. at 512 (emphasis added). Brief for School District of Pittsburgh, Appellant, at 20. Pittsburgh further notes that the United States Supreme Court has stressed in a number of cases that when religious institutions are benefited by state legislation, such benefits must be the incidental results of the legislation granting the benefits to all its citizens. See, e.g. Board of Education of Central School District No. 1 v. Allen, 392 U.S. 236, 238, 239, 241, 242, 243, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (upholding New York law providing for the direct free loan of secular textbooks to all public and nonpublic school children in the state); Lemon v. Kurtzman, 403 U.S. 602, 616, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971) (striking down Pennsylvania and Rhode Island statutes providing state aid to nonpublic schools for teachers' salaries, and distinguishing such aid from constitutionally permitted state programs such as "[b]us transportation . . . supplied in common to all students"). Also, in Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), in striking down a Pennsylvania statute providing tuition grants to parents of nonpublic school students, the United States Supreme Court stated:
. . . The State has singled out a class of its citizens for a special economic benefit. Whether that benefit be viewed as a simple tuition subsidy, as an incentive to parents to send their children to sectarian schools, or as a reward for having done so, at bottom its intended consequence *556 is to preserve and support religion-oriented institutions. We think it plain that this is quite unlike the sort of "indirect" and "incidental" benefits that flowed to sectarian schools from programs aiding all parents by supplying bus transportation and secular textbooks for their children. Such benefits were carefully restricted to the purely secular side of church-affiliated institutions and provided no special aid for those who had chosen to support religious schools. Yet such aid approached the "verge" of the constitutionally impermissible. Everson v. Board of Education, 330 U.S. 1, 16, [67 S.Ct. 504, 511, 91 L.Ed. 711] (1947). In Lemon v. Kurtzman, we declined to allow Everson to be used as the "platform for yet further steps" in granting assistance to "institutions whose legitimate needs are growing and whose interests have substantial political support." 403 U.S., at 624, [91 S.Ct., at 2117.] Again today we decline to approach or overstep the "precipice" against which the Establishment Clause protects. We hold that Pennsylvania's tuition grant scheme violates the constitutional mandate against the "sponsorship" or "financial support" of religion or religious institutions. 413 U.S. at 832-33, 93 S.Ct. at 2987 (emphasis in original).
Appellants' arguments on this point are based on the supposition that Act 372 confers unequal benefits upon students attending nonpublic schools. This is not the case. The statute requires that nonpublic school students receive transportation opportunities "identical" to those accorded public school students with the proviso that the district is not required to bus any student farther than ten miles from the district's borders. "Identical" in this context means that public and nonpublic school students must be bused to their schools if such schools are within the ten mile limit.[7] School *557 district boundaries are not sacrosanct; they are only flexible political lines drawn to accommodate the efficient administration of the educational system of this Commonwealth. It was clearly within the power of the General Assembly to enact the ten mile proviso in Act 372. The benefit sought to be conferred upon all students attending nonprofit schools was the right to free transportation to those schools. The maximum distance is the same for both public and nonpublic school students. The fact that the distance was computed in mileage and not confined to school district lines, we think, is of no constitutional consequence. On its face, then, because it confers its benefits equally upon students attending public and nonpublic schools, Act 372 does not violate the establishment clause by favoring a religious group.
Additionally, appellants contend that Act 372 is unconstitutional in its application. The three school districts have adopted pupil busing policies that prohibit the transportation of public school students out of the district. Thus, they contend, by forcing them to bus nonpublic school students out of the district these nonpublic school students receive "favors" or benefits not given to public school students. This argument misinterprets the requirements of Act 372. As stated above, Act 372 requires the school district to bus nonpublic school students to their schools if the district also has decided to bus public school students to the public schools. The maximum permissible distance in both cases is up to ten miles outside the school district's boundaries. The fact that appellants have of their own volition decided not to bus public school students up to ten miles outside their districts has no bearing on the statutorily imposed duty of the districts to bus nonpublic school students to their nonpublic schools once the district has undertaken to transport public school children.[8]
*558 Appellants rely heavily upon two United States district court opinions to support their position that Act 372 fails this second prong of the establishment test. In Americans United for Separation of Church and State v. Benton, 413 F.Supp. 955 (S.D.Iowa, 1975) (three-judge court per 28 U.S.C. §§ 2281, 2284 (1970)), the court issued a permanent injunction against the use of public funds to implement amendments to the Iowa school transportation program. The statutory scheme in Iowa drastically differs from the one before us. By law Iowa forbade the extra-district transportation of public school students but allowed such transportation for nonpublic school students. Because of this legally mandated disparity in treatment, the court found the statute to violate the establishment clause. The Benton decision is clearly distinguishable and appellants' reliance upon it is unjustified.
Appellants' reliance upon Members of Jamestown School Committee v. Schmidt, 427 F.Supp. 1338 (D.R.I. 1977) is also misplaced. In that case the court declared the statute unconstitutional after determining that it did not in fact provide transportation benefits to public and sectarian school children alike. The court viewed the statute as placing upon the taxpayers the requirement that they provide an additional option to the children attending out-of-district nonpublic  primarily sectarian  schools; an option not offered to public school students.[9] As we have previously *559 indicated, Act 372 provides for equality of treatment in the transportation of public and nonpublic students.

2.
Appellants contend that Act 372 is an artifice whereby students attending church-related schools are favored under the guise of benefitting all students. See, Meek v. Pittenger, supra. 421 U.S. at 365, 95 S.Ct. 1753; Sloan v. Lemon, supra, 413 U.S. at 832-33, 93 S.Ct. 2982. They stress, and we agree that of the nonpublic school students affected by this Act, the overwhelming majority attend church-related schools.[10] This special "favor" argument was dependent upon appellants' initial claim that Act 372 did not benefit public and nonpublic students alike. However, as we have expressed, this Act does not confer upon nonpublic school students greater transportation opportunities than it does upon public school students. Having determined that Act 372 provides identical benefit for all students, public as well as nonpublic, it is of no consequence that the nonpublic schools are predominantly church-related.
This instant statute is readily distinguishable from the legislation that was found to be constitutionally infirm in Sloan. There, the Court held unconstitutional a statute *560 whereby parents of children attending nonpublic schools were reimbursed by the state for a portion of the nonpublic school tuition. There was no comparable provision to benefit the parents of public school children. The Court distinguished such special class legislation from constitutionally permissible state aid benefitting all students:
We think it plain that this is quite unlike the sort of "indirect" and "incidental" benefits that flowed to sectarian schools from programs aiding all parents by supplying bus transportation and secular textbooks for their children. Sloan v. Lemon, supra, 413 U.S. at 832, 93 S.Ct. at 2986. (emphasis in original).
Consequently, we do not believe Act 372 runs afoul of the Court's ruling in the Sloan case.
Meek v. Pittenger also does not support appellants' position. In that case the Court struck down a Pennsylvania law providing for the direct loan to nonpublic schools of instructional materials,[11] but upheld the direct loan to nonpublic school students of secular textbooks, even though 75% of the students in these nonpublic schools attended church-related institutions. Meek v. Pittenger, supra, 421 U.S. at 364, 95 S.Ct. 1753. The Court determined that the textbook provision was indistinguishable from the New York statute upheld in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968)[12] and concluded that Pennsylvania's *561 textbook program was constitutional because the state "`merely makes available to all children the benefits of a general program to lend school books free of charge.'" Meek v. Pittenger, supra, 421 U.S. at 362, 95 S.Ct. at 1761. Additionally, the Court stated:
It is, of course, true that as part of general legislation made available to all students, a State may include church-related schools in programs providing bus transportation, school lunches, and public health facilities  secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school. The indirect and incidental benefits to church-related schools from those programs do not offend the constitutional prohibition against establishment of religion. Id., at 364-65, 95 S.Ct. at 1763 (citations omitted).

3.
Pequea contends that despite the Supreme Court's contrary holding in Everson v. Board of Education, the primary effect of the public transportation of parochial school students is to aid in the establishment of religion. Pequea argues that the Supreme Court's analysis of the New Jersey transportation statute in Everson was faulty and contains "numerous fallacies and inconsistencies . . . which should preclude the Everson decision from serving as a binding legal precedent" in the cases now before us. Brief for Pequea Valley School District, Appellant, at 19. Primarily, Pequea contends that "the benefits conferred upon sectarian schools by virtue of mandatory busing laws, such as *562 Act 372, are not as secondary or indirect as the majority in Everson would have it seem." Id., at 20.
Although Pequea's arguments against following Everson's indirect effect theory have gained some support,[13] this Court is not at liberty to disregard a case so fundamental in the jurisprudence of the establishment clause. Indeed, the Everson opinion has been acknowledged in all recent cases arising under this clause. See, e.g., Meek v. Pittenger, supra, 421 U.S. at 359-60, 95 S.Ct. 1753; Committee for Public Education & Religious Liberty v. Nyquist, supra, 413 U.S. at 770-75, 93 S.Ct. 2955; Lemon v. Kurtzman, supra, 403 U.S. at 611-12, 91 S.Ct. 2105; Board of Education v. Allen, supra, 392 U.S. at 241-44, 88 S.Ct. 1923. Consequently, we must decline Pequea's call to renounce the Everson opinion.
We are satisfied that the indirect and incidental benefit concept of Everson as refined by subsequent decisions, permits the type of governmental action which occurred here. Act 372 provides the parents of all school children with the assurance of the safety of their children in travelling to and from school. The fact that this benefit is enjoyed by the child attending parochial school as well as the public school youngster is not the type of benefit which *563 offends the concept of neutrality mandated by the establishment clause.[14] As we noted in Rhoades, the "cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment." Rhoades v. Abington Township School District, supra 424 Pa. at 212, 226 A.2d at 60.

D.
The third and last prong of the religious establishment test under which the constitutionality of Act 372 must be measured, is the requirement that the Act not result in excessive government entanglement with religion. The requirement of no excessive entanglement was "born of a desire to minimize government intrusion into the religious realm." L. Tribe, American Constitutional Law 865 (1978). A finding of excessive entanglement, typically in the administration of the statute in question, can serve directly to invalidate a government program. Id., at 866.[15]
*564 The test we must employ in this area was formulated by Chief Justice Burger in Lemon v. Kurtzman, supra, 403 U.S. at 615, 91 S.Ct. at 2112:
In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority.
The state program must not require a "comprehensive, discriminating, and continuing state surveillance" to ensure that the state aid is used solely for secular purposes. 403 U.S. at 619, 91 S.Ct. at 2114. Nor must the aid require "state inspection and evaluation of the religious content of a religious organization" because this is the very "sort of entanglement that the Constitution forbids." Id., at 620, 91 S.Ct. at 2115.
The Court in Lemon v. Kurtzman struck down Pennsylvania and Rhode Island statutes providing cash grants to nonpublic schools in an effort to defray part of the costs of teachers salaries. The Court found that these statutes required excessive interference by the state into the activities of the religious school beneficiaries to ensure that the funds were spent for secular purposes only. Professor Tribe has suggested that the following forms of state aid do not infringe upon the entanglement concerns of the establishment clause:
When states provide church-related schools with "secular, neutral, or non-ideological services, facilities, or materials," *565 such as "bus transportation, school lunches, public health services, and secular textbooks supplied in common to all students," the resulting relatively mechanical contacts between church and state do not cross the "blurred, indistinct, and variable barrier" which the establishment clause interposes between the two.
L. Tribe, American Constitutional Law, supra at 870, quoting Lemon v. Kurtzman, supra, 403 U.S. at 614, 91 S.Ct. 2105. Accord, Wolman v. Walter, supra, 97 S.Ct. at 2601-05.
In applying the test set forth in Lemon v. Kurtzman, we note that the primary and intended beneficiaries of Act 372 are the individual students and not the schools they attend. Any benefits derived from the Act by these schools are remote and incidental. The nature of the aid provided by Act 372 is in the form of free transportation of nonpublic school students to their schools. Unlike the facts in Lemon v. Kurtzman, here the religious institutions do not receive any funds under this Act. And, unlike the parents who received cash tuition reimbursements from the state in Sloan v. Lemon, here the parents do not receive any monetary benefit from the state. In the cases before us, the parents receive only the intangible benefit arising from the knowledge that their children are being safely transported to and from their schools. Additionally, this benefit is conferred without regard to whether or not the school attended has a religious mission.
Finally, we must look at the resulting relationship between the government and the religious institution resulting from the state aid. As mentioned earlier, Wolman v. Walter[16] involved the constitutionality of field trip transportation at public expense for nonpublic school students who visited secular governmental, industrial, cultural, and scientific centers. The Court found that "it is the individual teacher who makes a field trip meaningful . . . [A]nd where the teacher works within and for a sectarian institution, an unacceptable risk of fostering of religion is an inevitable byproduct." 433 U.S. at 253, 254, 97 S.Ct. at 2608. *566 It was determined that this state program encouraged excessive entanglement because
. . . the public school authorities will be unable adequately to insure secular use of the field trip funds without close supervision of the nonpublic teachers. This would create excessive entanglement:
"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church." Lemon v. Kurtzman, 403 U.S. at 619, 91 S.Ct. 2105, at 2114, 29 L.Ed.2d 745.
433 U.S. at 254, 97 S.Ct. at 2609.
Appellants would have us invalidate Act 372 because, like the field trips in Wolman, the nonpublic school controls the timing, frequency and destination of the busing. Appellants' arguments ignore the key fact upon which Wolman was decided: the required regulation of nonpublic school teachers. The Act before us does not in any manner require the state to engage in "a comprehensive, discriminating and continuing" surveillance of the nonpublic school teachers. The relationship that Act 372 creates between the state and nonpublic schools is no different than that existing under prior law. We upheld that relationship against constitutional attack in Rhoades v. Abington Township School District, 424 Pa. 202, 226 A.2d 53, cert. denied, 389 U.S. 846, 88 S.Ct. 36, 19 L.Ed.2d 114, appeal dismissed, 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1967). The only contact between the state and the nonpublic schools is in the relatively sterile environment of calendar control. Under these circumstances we hold that the relationship between the state and the nonpublic schools created by Act 372 is not one that involves excessive state entanglement with the religious affairs of the nonpublic schools.

*567 E.
In summary, it is our view that Act 372 requires students attending public and nonpublic schools to be transported to their schools if such schools are within ten miles of the school district borders; the Act requires public and nonpublic school students to have equal transportation services; the Act does not confer greater benefits upon nonpublic school students than upon those attending public schools; that although students attending church-related schools are the predominant nonpublic beneficiaries of the Act, the transportation provided by the Act is totally unrelated to the religious mission of these schools; the primary beneficiaries in fact are the students and any remote benefit received by the nonpublic schools is too indirect and incidental to render the Act constitutionally infirm; and that the Act does not require excessive governmental entanglement with the affairs of the religious schools involved. Consequently, Act 372 on its face and as applied, does not violate the first amendment's prohibition against laws "respecting the establishment of religion."

PART II.

The Equal Protection Argument
Appellants make two arguments that Act 372 violates the equal protection clause of the fourteenth amendment to the federal constitution.[17] The first is grounded upon their belief that the Act confers greater benefits upon nonpublic school students than upon students attending public school. We rejected this same contention in relation to appellants' challenge to Act 372 on establishment clause grounds and believe it fails to support an equal protection claim. The Act provides total equality in treatment to public and nonpublic school students. The fact that the *568 school districts have refused to transport public school students out of their districts does not require us to invalidate this Act.
The other equal protection challenge to Act 372 centers around the express exclusion of students in nonpublic schools operated for profit from the terms of the coverage of Act 372. Basically Pequea Valley argues that if public and parochial school students receive free transportation, equal protection demands that students attending nonpublic profit-making schools also must receive free transportation. Pequea sees Act 372 as establishing an invidious, intentional and systematic discrimination, arguing that if the legislative purpose of the Act is to provide safe transportation there is no rational basis for conferring that benefit upon some school children and not upon others. We disagree.
The United States Supreme Court has made it clear that legislative classifications will not fail under an equal protection analysis "if any state of facts rationally justifying it is demonstrated to or perceived by the courts." United States v. Maryland Savings Share Insurance Corp., 400 U.S. 4, 6, 91 S.Ct. 16, 17-18, 27 L.Ed.2d 4 (1970) (per curiam) (emphasis added). Additionally, "legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent," McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). Consequently, the equal protection clause will set aside statutory classifications "only if no grounds can be conceived to justify them." Id., citing cases (emphasis added).[18] It is not unreasonable to infer from Act 372 that the *569 General Assembly thought that parents who could afford the costs of sending their children to nonpublic profit-making schools could also afford the costs of seeing that their children were safely transported to such proprietary schools. A classification along these lines is neither irrational nor invidious. The local school districts and the Commonwealth itself have only limited resources with which to combat a host of social and economic ills. We cannot say that the legislative refusal to part with some of these scarce resources and provide free transportation to all children attending any school within the Commonwealth lacked a reasonable basis. It is clear that "the Equal Protection Clause does not require that a state must choose between attacking every aspect of a problem or not attacking the problem at all." Dandridge v. Williams, 397 U.S. 471, 486-87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). We hold that Act 372 does not violate the equal protection clause of the fourteenth *570 amendment by failing to provide free transportation for students attending private profit making schools.

III.

The State Challenges
Appellants contend that three separate provisions of our state constitution are violated by Act 372 on its face or through the interpretation given it by the Secretary of Education and the Commonwealth Court.[19] We disagree and uphold the Act against these state constitutional challenges.
The school districts claim that Article 1 Section 3, Article 3 Section 15, and Article 3 Section 29, alone or in combination operate to bar the enforcement of Act 372. The relevant portions of these constitutional provisions are as follow:
Art. 1, § 3. Religious Freedom
. . . no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; . . . and no preference shall ever be given by law to any religious establishments or modes of worship.
Art. 3, § 15. Public School Money Not Available To Sectarian Schools
No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school.
Art. 3, § 29. Appropriations for Public Assistance, Military Service, Scholarships
. . . No appropriation shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution, corporation or association . . . .
*571 We need not reach these state constitutional challenges unless our constitution provides more stringent limitations upon the church-state relationship than does the federal constitution. In answering this threshold question we believe that the limitations contained in our constitution do not extend beyond those announced by the United States Supreme Court in interpreting the first amendment to the federal constitution.
First, we have earlier held that the provisions of Article I, Section 3 of our constitution do not exceed the limitations in the first amendment's establishment clause. Wiest v. Mt. Lebanon School District, 457 Pa. 166, 174, 320 A.2d 362, 366, cert. denied, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974). In that case we discussed Article I, Section 3 and stated:
The principles enunciated in this part of our Constitution reflected a concern for the protection of the religious freedoms of Pennsylvanians long before the first amendment to the United States Constitution was made applicable to the states through the fourteenth amendment. Provisions identical to the above section were contained in the Constitutions of 1790 and 1838 and a similar provision was contained in the Constitution of 1776. On the authority of this provision, this Court has prohibited the use of a public schoolroom for Catholic religious instruction after hours, Hysong v. Gallitzin Borough School District, 164 Pa. 629, 30 A. 482 (1894), and the use of public school property for sectarian religious purposes when school was not in session, Bender v. Streabich, 182 Pa. 251, 37 A. 853 (1897). The protection of rights and freedoms secured by this section of our Constitution, however, does not transcend the protection of the first amendment of the United States Constitution. Id. (emphasis added).
Second, the limitations provided in Article III, Sections 15 and 29 apply only when state funds flow to the sectarian school or institution. In the cases before us, no state monies reach the coffers of these church-affiliated schools. Additionally, the transportation provided by Act *572 372 does not support any sectarian school  it merely confers upon all children the right to be transported safely to their schools.[20]
Consequently, our discussion of the issues raised under the federal constitution applies with equal vigor to the issues raised today by appellants under our state constitution. Accordingly, we reject appellants' challenges to Act 372 that are grounded upon our state constitution.
The Orders at Numbers 101, 385 and 393 are affirmed.
O'BRIEN, J., and POMEROY, former J., did not participate in the decision of these cases.
ROBERTS, J., filed a dissenting opinion in which LARSEN, J., joined.
ROBERTS, Justice, dissenting.
The majority construes Act 372 to require a school district providing any free transportation to resident pupils also to transport every resident pupil to that pupil's public or nonprofit nonpublic school as far as ten miles outside the district. I disagree with the majority's interpretation of Act 372. The clear and unambiguous language of Act 372 authorizes school districts to exercise discretion and develop their own policies concerning the scope and nature of the *573 transportation services it will offer its residents, so long as "identical" services are provided public and nonprofit nonpublic school students. See 1 Pa.C.S.A. § 1921. As thus construed, appellant school districts are in compliance with Act 372, rendering it unnecessary to reach the federal and state constitutional issues which the majority undertakes to decide. See Mt. Lebanon v. County Board of Elections, 470 Pa. 317, 322, 368 A.2d 648, 650 (1977) (constitutional questions should be avoided where a non-constitutional ground is dispositive). I therefore dissent.
Act 372 does not require a school district to provide any free transportation to any resident pupil of any school.[*] The act simply permits use of school district funds to pay for "free transportation of any resident pupil to and from the kindergarten, elementary school, or secondary school in which he is lawfully enrolled" should the school board choose to provide such transportation. Two conditions are placed *574 upon this authority to use school district funds for free transportation. The schools to which resident pupils are transported must be "not operated for profit" and must be "located within the district boundaries or outside the district boundaries at a distance not exceeding ten miles by the nearest public highway." Thus, the first sentence of Act 372 grants a school board power to provide free transportation to any nonprofit school up to but not exceeding ten miles outside the district lines. The plain language of Act 372 does not require that, once a school board chooses to transport any student to any nonprofit school within the district or up to ten miles outside the district, it must transport all resident students to all qualifying schools. Rather, the Legislature leaves to the discretion of the school board the geographical scope of busing.
This reading of the first sentence of Act 372 is reaffirmed when compared to the language of the last sentence of the Act's first paragraph and section four of the Act. See 1 Pa. C.S.A. § 1921(a) (statutes to be construed so as to give meaning to all their provisions). The last sentence of the first paragraph provides: "The board of school directors shall provide such transportation whenever so required by any of the provisions of this act or of any other act of Assembly." The Legislature's use of mandatory language here, when contrasted with the permissive language of the first sentence, confirms the view that the first sentence merely grants school districts the power to act. It does not make action of any nature obligatory. Further, Section 4 of Act 372 provides: "Nothing in this act shall be construed to require or authorize the assignment or transportation of any pupil by any board of school directors to any school outside the boundaries of the district in which the pupil resides, except with the consent of the board of school directors, or in the case of a nonpublic school, the authorities responsible therefor, in the district to which the pupil would be assigned, as provided in sections 1310, 1315 and 1316 of the act of March 10, 1949, (P.L.30) known as the `Public School Code of 1949,' as amended October 19, 1959 (P.L. 1324)." Had the *575 legislature meant to impose a mandatory duty on school districts to transport students outside the district lines up to a distance not exceeding ten miles, it would have been unnecessary to use the language "require or authorize" in Section 4.
The "identical provision" requirement imposed by the second sentence of Act 372 does not alter this reading. The second sentence mandates that when transportation is provided for public school pupils, "identical provision" must be made for nonpublic school pupils. It does not require transportation not provided public school pupils be provided nonpublic school pupils. Act 372 forbids school boards from treating public school students in a preferential or special manner. So too it is forbidden to treat nonpublic school students in a preferential manner by providing them with transportation not provided public school students. All resident pupils, whether they attend public or nonprofit nonpublic schools must be treated identically. For example, the same mode of transportation must be offered to all students. Public school students may not be transported on school buses while nonpublic school students are given money to subsidize the cost of public transportation. Public school students may not be provided free transportation if they live more than one and a half miles from their schools, while nonpublic school students are required to walk to school unless they live more than two miles away from school. The "identical provision" requirement simply demands that the nature and scope of services afforded public school students be replicated for nonpublic school students. The "identical" requirement does not impose any duty upon school districts to transport all resident pupils to their schools no matter where they may be located within the maximum limit of ten miles outside the district lines. It merely requires that a policy not to transport students over district lines or only a certain distance over district lines be applied to public and nonpublic school students alike. Had the Legislature intended to require complete extra-district busing whenever any busing whatsoever is undertaken, it could easily have *576 done so. Instead it only required that equal opportunities for free transportation be provided to all resident pupils in a school district. Accordingly, I would reverse the order of the Commonwealth Court.
LARSEN, J., joins in this dissenting opinion.
NOTES
[1] See Briefs for the Department of Education, Commonwealth of Pennsylvania, Appellee, at n.2. The Kiski Area and McKeesport School Districts are the other two recalcitrant districts.
[2] The Department of Education has not appealed the Commonwealth Court's ruling that the Department was without authority to order that the school districts' transportation reimbursement subsidies be recovered and withheld until each district complied fully with the requirements of Act 372.
[3] See note 5, infra.
[4] In Rhoades v. Abington Township School District, 424 Pa. 202, 226 A.2d 53, cert. denied, 389 U.S. 846, 88 S.Ct. 36, 19 L.Ed.2d 114, appeal dismissed, 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1967), the Court upheld Act 91 against state and federal constitutional challenges. Act 91 amended the Public School Code of 1949 to allow students attending nonpublic schools to be transported by public school buses to and from their schools if such schools were along the "established routes" of the public school buses. See 424 Pa. at 220, 224, 226 A.2d at 63, 65. Act 372 amended the Public School Code by eliminating the "established routes" restriction on the public transportation of students attending nonpublic schools. Under Act 372, nonpublic and public school children have the right to be transported to their school even if the school lies up to ten miles outside the school district's boundaries.
[5] In Everson v. Board of Education of Township of Ewing, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court upheld a New Jersey statute which had the same basic objective as Act 372:

When any school district provides any transportation for public school children to and from school, transportation from any point in such established school route to any other point in such established school route shall be supplied to school children residing in such school district in going to and from school other than a public school, except such school as is operated for profit in whole or in part.
Justice Black's opinion for the five-man majority held that the statute did not violate the federal due process or establishment clauses. The Court held that the primary beneficiaries of the Act were children in general and not the religious schools they attended. It was acknowledged that without the aid provided by the statute, some parents could not afford to send their children to nonpublic schools and that one result of the statute would be to allow some nonpublic school students to remain in those schools. The majority saw such a result as being an indirect and incidental benefit flowing to the nonpublic institution. Because the primary beneficiaries of the statute were the school children and because no state money ever directly reached the coffers of the nonpublic schools, the fact that the nonpublic schools incidentally benefited did not result in the act being unconstitutional. In discussing the concept of neutrality required, Justice Black wrote, "State power is no more to be used so as to handicap religions, than it is to favor them." 330 U.S. at 18, 67 S.Ct. at 513. He stressed that the establishment clause "was intended to erect `a wall of separation between church and state.'" Id. at 16, 67 S.Ct. at 512. "That wall must be kept high and impregnable. We could not approve the slightest breach." Id. at 18, 67 S.Ct. at 513. And, although he expressed the view that the New Jersey statute "approaches the verge" of the state's lawful power, Id. at 16, 67 S.Ct. at 512, he concluded that New Jersey had not breached that wall.
[6] It should be noted that this portion of Act 372 is not before us in these appeals. We consequently need not consider the constitutionality of the field trip provision in Act 372. We do note, however, that the field trip provision involved in the Wolman case was found to be unconstitutional. Additionally, we note that the state Attorney General has ruled the field trip provision of Act 372 to be unconstitutional in its application to sectarian nonpublic schools. See 1977 Op.Atty. Gen. No. 15.
[7] We agree with the analysis of the Commonwealth Court as to this point:

The Act means (1) that if the district chooses to provide free transportation at all it shall provide it to all pupils, public and nonpublic, attending schools within the district or without the district at a distance not exceeding ten miles, and (2) that the transportation services provided to nonpublic school pupils must be the same as those provided to public school pupils.
School District of Pittsburgh v. Commonwealth of Pennsylvania, Department of Education, 33 Pa.Cmwlth. 535, 550-51, 382 A.2d 772, 779 (1978).
[8] The Commonwealth Court properly noted:

The facts that the School District of Pittsburgh presently has no occasion to transport public school pupils outside the district and that the school board has declared, contrary to statutory law, that it will not do so, provide no foundation for a declaration that the primary effect of a statute requiring the board to transport all resident pupils to their schools within or without the district is to advance the religion of pupils who would be transported to church schools. Act 372 makes no distinction in conferring its benefits between Pennsylvania public and nonpublic pupils.
Id., 33 Pa.Cmwlth. at 548-49, 382 A.2d at 778.
[9] We do not accept the district court's implicit premise that the equality of benefit is to be determined by a comparison of the cost involved. The benefit provided is safe transportation to and from school for all students; the fact that the cost of conferring this benefit may vary is not significant for this purpose. A constitutional consideration would arise only if the cost of transportation for the students attending sectarian schools was so disproportionate that it became apparent that the transportation provided to the public school youngster was merely a ruse to confer a benefit to the sectarian school pupil. Such is clearly not the case here.
[10] In the Pittsburgh case, for example, the parties stipulated that eighteen of the nineteen nonpublic schools whose students benefit under Act 372 are affiliated with religious institutions. Fifteen of those eighteen are affiliated with the Roman Catholic Church. Brief for School District of Pittsburgh, Appellant, at 22. In 1975, the Supreme Court stated that "of the 1,320 nonpublic schools in Pennsylvania that comply with the requirements of the compulsory-attendance law . . . more than 75% are church-related or religiously affiliated educational institutions." Meek v. Pittenger, 421 U.S. 349, 364, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217 (1975). See also Sloan v. Lemon, 413 U.S. 825, 830, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973) (in 1973, more than 90% of the children attending nonpublic schools in Pennsylvania were enrolled in religiously affiliated schools); Lemon v. Kurtzman, 403 U.S. 602, 610, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (in 1969 more than 96% of the nonpublic school students were attending church-related schools, most of which were affiliated with the Roman Catholic church).
[11] Where the nonpublic school rather than the child is the recipient of state funded services, "this fact alone may be sufficient to invalidate the program as impermissible direct aid." Wolman v. Walter, 433 U.S. 229, 253, 97 S.Ct. 2593, 2608, 53 L.Ed.2d 714 (1977).
[12] In discussing the Allen case, the Court in Meek stated:

Approval of New York's text book loan program in the Allen case was based primarily on this Court's earlier decision in Everson v. Board of Education, supra, holding that the constitutional Prohibition against laws "respecting an establishment of religion" did not prevent "New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools." 330 U.S. at 17, 67 S.Ct. at 512. Similarly, the Court in Allen found that the New York textbook law "merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." 392 U.S., at 243-244, 88 S.Ct. at 1926. The Court conceded that provision of free textbooks might make it "more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in Everson and does not alone demonstrate an unconstitutional degree of support for a religious institution." Id., at 244, 88 S.Ct., at 1927. Meek v. Pittenger, 421 U.S. 349, 359-60, 95 S.Ct. 1753, 1760-61, 44 L.Ed.2d 217 (1975).
[13] We note that Pequea is not alone in its assault upon that portion of the Everson decision. The vote in that case was five to four, and the opinion engendered two well-considered dissents. Justice Douglas, who voted with the majority in Everson, later defected to the side of the dissenters. In Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (striking down a nondenominational prayer composed by state authorities for use in public schools), Justice Douglas wrote a concurring opinion in which he considered the Everson decision and, finding it to have been inconsistent with the principles of the first amendment religion clauses, stated that Justice Rutledge's dissenting opinion was the better view. He reaffirmed his defection from the Everson majority in his dissenting opinion in Walz v. Tax Commission of City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (majority upheld state property tax exemption for religious organizations). Additionally, some commentators also have supported the move to abandon Everson and to correct what they consider to be flaws in its reasoning. See, e.g., Carroll, The Constitution, the Supreme Court, and Religion, 51 Am.Pol.Sci.Rev. 663 (1967).
[14] In this context, it must be noted that the right of parents to send their children to parochial schools is constitutionally protected. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).
[15] The Constitution also forbids political entanglements. This notion focuses on political division along religious lines. In striking down Pennsylvania and Rhode Island cash grants to nonpublic schools to partially defray the costs of teachers salaries, Chief Justice Burger wrote a classic statement of this issue:

A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was intended to protect. . . . The potential divisiveness of such conflict is a threat to the normal political process. Lemon v. Kurtzman, 403 U.S. 602, 622, 91 S.Ct. 2105, 2115-16, 29 L.Ed.2d 745 (1971) (citations omitted).
In the cases before us, we are concerned with the problem of administrative entanglement.
[16] See footnote (6) and accompanying text, supra.
[17] In addition, the Pequea Valley School District raises a due process argument against Act 372. Pequea acknowledges that this issue was decided by the United States Supreme Court in Everson v. Board of Education, 330 U.S. 1, 5-8, 67 S.Ct. 504, 91 L.Ed. 711 (1947). We decline to re-open this question and reach a contrary result.
[18] We fail to subject Act 372 to "strict scrutiny" because that test does not apply to state social and economic legislation  such as Act 372  even when these laws are challenged as resulting in such disparity of treatment as to violate the equal protection clause. Dandridge v. Williams, 397 U.S. 471, 484, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). In that case the Supreme Court stated:

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Id., 397 U.S. at 485, 90 S.Ct. at 1161 (citation omitted).
We recognize that strict scrutiny is appropriate when the challenged legislation infringes upon fundamental rights. We further acknowledge that the equal protection clause includes within its sweep the freedoms of speech and religion contained in the first amendment. Niemotko v. Maryland, 340 U.S. 268, 272, 71 S.Ct. 325, 95 L.Ed. 267 (1951). In this portion of appellants' equal protection claim, however, fundamental rights are not involved. Appellants claim that students attending nonpublic profit-making schools are denied the transportation opportunities that all other children are accorded by Act 372. First, the denial of such transportation opportunities is not an infringement upon fundamental rights in these circumstances. Second, the group denied transportation under the act is not a "suspect class" so as to demand automatic strict scrutiny; and neither is it a "semi-suspect class" so as to demand "intermediate scrutiny" by this Court. Consequently, the traditional equal protection rational basis test is appropriate in resolving appellants' instant claim. We note that when faced with a similar challenge to its pupil transportation program, the New Jersey Supreme Court refused to apply the strict or intermediate scrutiny tests and upheld the program after finding it to rest upon a rational legislative basis. See West Morris Regional Board of Education v. Sills, 58 N.J. 464, 279 A.2d 609 cert. denied, 404 U.S. 986, 92 S.Ct. 450, 30 L.Ed.2d 370 (1971).
[19] Appellants also urge us to interpret Act 372's use of the word, "identical" to require only the intra-district transportation of nonpublic school students. We have earlier declined to adopt such an interpretation of the statute. Instead, we believe the Act provides the same transportation opportunity for all students; i.e., to and from their schools if such schools are within ten miles of the school district's borders.
[20] In Rhoades v. Abington Township School District, 424 Pa. 202, 226 A.2d 53, cert. denied, 389 U.S. 846, 88 S.Ct. 36, 19 L.Ed.2d 114, appeal dismissed, 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1967), Justice Musmanno stated for the Court that transporting a child at public expense to a parochial school cannot "be regarded as supporting a place of worship. The purpose of the school bus is to take children to a structure where they will receive a secular education." Id., 424 Pa. at 219, 226 A.2d at 63. Consequently, these school buses "are operated for the benefit of the children who ride it (sic) and not for the benefit of the church which may be associated with the school in which the children receive a State-supervised education." Id., 424 Pa. at 222, 226 A.2d at 64. See also, Schade v. Allegheny County Institution District, 386 Pa. 507, 512, 126 A.2d 911, 914 (1956) (upholding state laws providing for payment of county-raised tax revenues to denominational or sectarian institutions or homes for the board, care and maintenance of neglected or dependent children on order of the county juvenile court because these funds were, "in legal effect, payments to the child,  not the institution supporting and maintaining him or her").
[*] Act 372 provides in part:

"The board of school directors in any school district may, out of the funds of the district, provide for the free transportation of any resident pupil to and from the kindergarten, elementary school, or secondary school in which he is lawfully enrolled, provided that such school is not operated for profit and is located within the district boundaries or outside the district boundaries at a distance not exceeding ten miles by the nearest public highway, except that such ten-mile limit shall not apply to area vocational technical schools which regularly serve eligible district pupils or to special schools and classes approved by the Department of Education, and to and from any points in the Commonwealth in order to provide field trips for any purpose connected with the educational pursuits of the pupils. When provision is made by a board of school directors for the transportation of public school pupils to and from such schools or to and from any points in the Commonwealth in order to provide field trips as herein provided, the board of school directors shall also make identical provision for the free transportation of pupils who regularly attend nonpublic kindergarten, elementary and high schools not operated for profit to and from such schools or to and from any points in the Commonwealth in order to provide field trips as herein provided. Such transportation of pupils attending nonpublic schools shall be provided during regular school hours on such dates and periods that the nonpublic school not operated for profit is in regular session, according to the school calendar officially adopted by the directors of the same in accordance with provisions of law. The board of school directors shall provide such transportation whenever so required by any of the provisions of this act or of any other act of Assembly."