James STRATHIE, Plaintiff on behalf of himself and all others similarly situated

v.

DEPARTMENT OF TRANSPORTATION COMMONWEALTH OF PENNSYLVANIA, et al.

Civ. A. No. 79–519.

United States District Court, E. D. Pennsylvania.

Oct. 1, 1982.

Joseph D. Harbaugh, Susan Hirsch, Philadelphia, Pa., for plaintiff.

Jerry I. Drew, and Carl Vaccaro, Deputy Attys. Gen., Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

In this civil rights class action, plaintiff, an individual with impaired hearing which necessitates he wear a hearing aid, alleges that the Pennsylvania Department of Transportation, the Pennsylvania Department of Education, and five named officials of those agencies, violated his rights, and those of the class he represents, by suspending their school bus driver's licenses.[1] Specifically, plaintiff alleges violations of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Rehabilitation Act of 1973 (29 U.S.C. § 794), the Pennsylvania Human Relations Act (43 P.S. § 951 et seq. (Purdon Pamphlet 1982)), and section 618(a)(1) of the Pennsylvania Vehicle Code (75 P.S. § 618(a)(1) (Purdon 1979) repealed and recodified, 75 Pa.C.S.A. §§ 1532, 1533 (Purdon 1982)). Plaintiff seeks a dec-

---

1. The case was certified as a class action in May, 1980. Docket Entry 24. Plaintiff seeks relief for himself and for all persons in Pennsylvania with hearing impairments that have caused their school bus driver's licenses to be suspended.

laration that the policies, practices, and procedures of the defendants are unconstitutional and violate federal and state statutes; a permanent injunction prohibiting defendants from enforcing these policies, practices, and procedures; reinstatement of his school bus driver's license at a seniority status as if his license had never been suspended; compensatory damages including back pay; and attorneys' fees.

Plaintiff, James Strathie, began to wear a hearing aid in 1947 following ear damage suffered in World War II. In October, 1976, Strathie applied for employment as a school bus driver and was hired by Van Trans Inc., a private bus company. Soon thereafter, the Pennsylvania Department of Transportation issued him a temporary (90 day) Class 4 permit to drive a school bus. In January, 1977, Strathie applied for and was issued a permanent Class 4 license. After working for Van Trans as a bus driver for one day, Strathie was notified that effective February 9, 1977, his license would be suspended because he wore a hearing aid, in violation of Department of Transportation regulations.

Pursuant to statutory authority, the Medical Advisory Board (MAB) to the Department of Transportation had formulated a regulation prohibiting persons needing and wearing hearing aids from being licensed as school bus drivers. In delineating the reasons for its proposed regulation, the Board noted several foreseeable risks to the safety of school bus riders if buses were driven by a person with a hearing defect corrected by a hearing aid. Because of the considerations voiced by the Board and the Department of Transportation's concern for the safety of school bus riders, the regulation was adopted by the Department in 1970. Based on the video-tape testimony, depositions, exhibits, and all matters of record, I make the following:

## FINDINGS OF FACT

1. Plaintiff James Strathie is a 58-year old high school graduate. While serving in the armed forces during World War II, he suffered ear damage.

2. In 1947, Strathie had bilateral mastoid surgery and began to wear a hearing aid.

3. Since then, Strathie has worn several models of hearing aids; he currently wears a model which is built into the frame of his eyeglasses.

4. By use of the hearing aid, Strathie's hearing is corrected to within the decibel range considered to be normal hearing.

5. Strathie has held a valid Pennsylvania driver's license since he was 16 years old. This license authorizes him to drive automobiles, motorcycles, and all types of trucks, including tractor trailers.

6. For 15 years Strathie was self-employed driving trucks, including a thirty (30) foot tractor trailer; this employment included long-distance interstate trips, trips throughout Pennsylvania, and short trips within the area of the Council Rock School District.

7. Strathie also served as a volunteer ambulance driver in Bucks County, Pennsylvania, for 20 years.

8. Defendant Department of Transportation of the Commonwealth of Pennsylvania is the sole authority for the issuance of driver's licenses in Pennsylvania. The Department of Transportation is a recipient of federal funds.

9. Defendant Thomas Larsen is the Secretary of the Department of Transportation. As such, he has ultimate responsibility for the promulgation of regulations for the Department of Transportation.

10. The Bureau of Traffic Safety is a division within the Department of Transportation. Since at least 1975, the Bureau has received approximately 70 percent of its highway safety funds from the federal government.

11. Defendant Francis Gaffney was the Director of the Bureau of Traffic Safety at the time the complaint was filed. Robert Spena is the current director of the Bureau of Traffic Safety.

12. Defendant John McElhaney is Chief of Pupil Transportation which is a division

of the Bureau of Traffic Safety of the Department of Transportation. The Pupil Transportation Division is responsible for the enforcement of the regulation which prohibits hearing aid wearers from driving school buses.

13. Defendant Department of Education of the Commonwealth of Pennsylvania has authority to approve all means of pupil transportation within the Commonwealth. 22 Pa.Code § 23.2 (1975). The Department of Education is a recipient of federal funds.

14. Defendant Robert G. Scanlon is the Secretary of Education of the Commonwealth of Pennsylvania.

15. The Department of Education has adopted as part of its own regulations the requirement that all school bus drivers meet the "regulations of the Bureau of Traffic Safety of the .... Department of Transportation in regard to application, ... fitness, competence, ... licensing, physical examination and continuing eligibility." 22 Pa.Code § 23.1 (1975).

16. The Pennsylvania Vehicle Code authorizes the Pennsylvania Department of Transportation to establish, by regulation, the qualifications necessary for obtaining operating privileges and the manner of examining applicants to determine their qualifications. Act of June 17, 1976, P.L. 162, No. 81, 75 Pa.C.S.A. §§ 1504(c), 1508(a) (1976).

17. Pursuant to Pennsylvania law, the Medical Advisory Board of the Department of Transportation formulates "rules and regulations for adoption by the Department, on physical and mental criteria ... relating to the licensing of drivers...." 75 Pa.C.S.A. § 1517(b) (Purdon 1977).

18. The Medical Advisory Board is composed of a representative from each of five named Commonwealth administrative agencies, a physician from each of seven named medical specialties, and an optometrist. There is no board member whose medical specialty or expertise is diseases of the ear, or the evaluation and rehabilitation of hearing loss. 75 Pa.C.S.A. § 1517(a) (Purdon 1977).

19. Pursuant to statutory authority, the Medical Advisory Board formulated Department of Transportation regulation 101 (now regulation 150), which prohibits hearing aid wearers from being licensed as school bus drivers. (Regulation 101 became effective July 1, 1970; it was later superseded but not changed by regulation 150 of the Department of Transportation, effective July 1, 1979.)

20. The regulation provides that a person is physically qualified to operate a school bus if, among other enumerated qualifications, he: "has hearing loss no greater than 25 decibels ... in the better ear, *without a hearing aid.*" (emphasis added). 67 Pa.Code § 71.3(b)(5) (1979).

21. In October, 1976, Strathie applied for employment as a school bus driver with Van Trans, Inc., Newtown, Bucks County, Pennsylvania. Van Trans, Inc., is a private bus company which provides transportation for students in public school districts, including Council Rock School District.[2]

22. Strathie was hired and trained by Van Trans as a school bus driver. The Department of Transportation of the Commonwealth of Pennsylvania issued him a temporary Class 4 permit to drive a school bus for 90 days.

23. Van Trans told Strathie that he would be driving students of the Council Rock School District.

24. In January, 1977, Strathie applied for a permanent Class 4 driver's license to drive a school bus. He took the required tests and was issued the Class 4 license by the Department of Transportation of the Commonwealth of Pennsylvania.

25. Strathie worked for Van Trans as a bus driver for one day. He was then notified by the Department of Transportation that his school bus driver's license was suspended "indefinitely and until [his] competency [was] established," effective February 9, 1977, because he wore a hearing aid, in

---

2. Council Rock School District and its superintendent of schools were named as defendants in this case. Summary judgment was granted as to both by order dated May 12, 1980.

violation of the regulations of the Department of Transportation, for school bus drivers.

26. At the time his school bus driver's license was suspended, Strathie was in every respect other than his hearing, qualified under Department of Transportation regulations to continue to be licensed to drive a school bus. *With the use of a hearing aid,* Strathie's hearing was corrected within the decibel requirements of the regulations of the Department of Transportation to be a school bus driver.

27. At the time the Department of Transportation suspended his school bus driver's license, Strathie's salary at Van Trans was $3.75 per hour as a part time driver. Had his license not been suspended, Strathie would have made the job as a school bus driver with Van Trans his primary employment. Strathie's rate of pay at Van Trans, if hired and employed full time, would have been $4.75 per hour in 1978, $5.10 per hour in 1979, and $5.35 per hour in 1980.

28. Following suspension of his school bus driver's license, Strathie was hired as a part-time clerk in a hardware store. Continuing his employment at the hardware store until 1979, Strathie worked approximately 29 hours a week, at a salary of $3.85 per hour. His total income from that employment during the years 1977–79 was $11,403.51.

29. In 1979, Strathie changed his residence from Pennsylvania to Florida, where he passed the tests required under Florida law to become a school bus driver. Though qualified to drive a school bus in Florida, Strathie has yet to attain permanent employment as a bus driver.

30. Strathie has never been refused or discharged from a job because of his hearing impairment, except for the school bus driver job with Van Trans. Other than driving a school bus, Strathie has never been prevented by his hearing impairment from taking part in the usual activities of life. His hearing impairment has not affected his learning or driving ability in any way.

31. The plaintiff class consists of all persons who have had their Pennsylvania Class 4 school bus driver's licenses suspended since February 9, 1973, pursuant to Pennsylvania Department of Transportation regulation 150.

32. According to Department of Transportation records, the Class 4 licenses of at least 46 persons were suspended between February 9, 1973, and October 29, 1979, because they wore hearing aids. The Department of Transportation has continued to enforce this regulation since October 1979, by suspending the Class 4 licenses of additional bus drivers.

33. The plaintiff was unable to meet the minimum hearing acuity standards without the use of a hearing aid. It was for this reason that on February 2, 1977, his school bus operating privileges were suspended.

34. The regulation which prohibits people from driving school buses who need hearing aids to meet the minimum hearing standards for licensing as school bus drivers was formulated by the MAB and adopted by the Department of Transportation effective July 1, 1970.

35. The prohibition of the use of hearing aids by school bus drivers was imposed, *inter alia* for the following reasons,

(a) The ability to hear at a certain level and to localize sound are factors that are relevant to a determination of whether a person is competent to operate a school bus.

(b) Hearing aids are non-passive mechanical devices that are subject to unpredictable breakdowns.

(c) The volume of a hearing aid can be turned lower by the user in noisy situations such as found in a school bus. There is no way of testing which hearing aid users would or would not turn down their hearing aids in noisy situations.

(d) Hearing aids are battery operated. Batteries wear down or may be defective. The only warning that a hearing aid wearer receives when a battery wears out is a gradual diminution of volume.

(e) Hearing aids can accidentally become dislodged from the ear.

(f) A person with impaired hearing, wearing a hearing aid, has more difficulty determining the direction from which a sound originates than does a person whose hearing is not impaired.

(g) Some hearing aids, such as the one worn by plaintiff when his school bus operating privileges were suspended, distort sound and are inadequate to permit the wearer to localize sound.

(h) School buses carry 72 passengers.

(i) A school bus driver must be aware of what is occurring on the school bus at all times.

36. In adopting the hearing aid ban, the board gave no consideration to the different types of hearing loss or the corrective results of hearing aids on the various types of hearing loss.

37. In 1972, the Medical Advisory Board met to review the physical requirements for school bus drivers under the regulation. Dr. James Cole participated in the meeting as a physician advisor on hearing.

38. With regard to the hearing requirement, it was the consensus of the board that any applicant or operator who is required to wear a hearing aid should be disqualified as a school bus driver.

39. The board took this position despite the fact that:

(a) Statistics show deaf drivers have a better record than those with normal hearing because they are more cautious; and

(b) The board's medical advisor on hearing, Dr. Cole, advised the board that federal safety standards for commercial truck drivers allow for a greater hearing loss than the board's regulation allowed.

40. There was no hearing specialist or audiologist on the board at the time of this meeting.

41. The board gave no consideration to implementing a system of individual hearing evaluations of applicants with hearing aids even though such individual determinations are routine for school bus driver applicants with other physical impairments.

42. No evidence or expert opinions were presented to MAB which indicated that hearing aid wearers had lower driving safety records than persons with normal hearing. No expert opinions were presented to show that hearing aid wearers were less qualified in any respect to drive school buses than persons with normal hearing.

43. Between the 1972 Board meeting and October, 1979, the Department of Transportation failed to obtain any expert opinions, conduct any studies, or collect or use any data or documents evaluating the relationship between the use of hearing aids and school bus driving or safety.

44. Between the 1972 meeting and October, 1979, the Department of Transportation did not develop qualifications or procedures for school bus driver licensing on the basis of any empirical survey or other objective research, and did not evaluate the reliability or validity of the qualifications which it required under its hearing aid regulation. The Department of Transportation did not gather data on the relative safety records of school bus driver licensees and other classes of licensees, with or without hearing impairments.

45. In October, 1979, the MAB again reviewed the hearing aid regulation, and recommended that the ban remain in effect. The board's decision to retain the ban was based on a reading of the minutes of the 1972 board meeting and a restatement of the same fears that had been expressed at the 1972 meeting concerning the possibility of hearing aid or battery malfunction, dislodgment, hearing aid turn-off by the wearer, noise amplification, and inability to know the direction of the source of sounds.

46. At the time of the 1979 meeting, no board member physician was a hearing specialist or an audiologist. No hearing specialist or audiologist presented any evidence to verify the board's fears regarding the bases for the hearing aid ban.

47. Although the board stated at the 1979 meeting that it would continue to study the matter, it has prepared no report on the hearing aid ban since that time.

48. The safety and welfare of children riding school buses is the primary concern of the Department of Transportation.

49. School bus drivers are specially licensed by the Commonwealth of Pennsylvania.

50. Unlike other drivers, school bus drivers must undergo extensive annual physical examinations.

51. In addition to his driving tasks, a school bus driver must be able to control the children on the bus and deal with any emergency or other situations that may arise.

52. The Department of Transportation, as a recipient of federal funds, was required by federal regulations, 45 C.F.R. § 84.6(c) (1977), to conduct a self evaluation of its rules and regulations by May 1978, to determine if it was in compliance with the requirements of the Rehabilitation Act of 1973 (29 U.S.C. § 794 et seq.) and the federal regulations promulgated thereunder (45 C.F.R. § 84 et seq. (1977)). The Department of Transportation has neither conducted this evaluation, nor developed any transition plan directed toward achieving compliance.

53. The Department of Transportation has made no affirmative efforts to increase the number of hearing impaired persons eligible for each class of drivers licenses, or to revise the qualifications or standards for school bus drivers licenses so that qualified hearing impaired persons will be eligible to obtain such licenses.

54. The only action taken by the Department of Transportation with regard to its obligations to hearing impaired persons under federal law was the transmittal, on August 13, 1979, from the Department's Bureau of Equal Opportunity to the Pupil Transportation Division, of a copy of the regulations of the United States Department of Health, Education and Welfare regarding non-discrimination on the basis of handicap. This document was sent without comment or request for action.

55. Audiology is the science and practice of evaluating the hearing process. Precisely calibrated testing instruments enable the audiologist to determine the nature and extent of a person's hearing loss, and to evaluate the person's ability to hear. This treatment includes the prescription of a hearing aid when appropriate.

56. Audiological tests can be conducted easily, quickly, and inexpensively. Strathie's testing took approximately one hour and cost $39.00.

57. There are three types of hearing loss: (a) conductive loss, caused by damage or blockage to the ear passages, which results in a reduction in the volume of the person's hearing; (b) sensory-neural loss, caused by damage to the nerves, which results in a volume reduction and a distortion of sound; and (c) aphasia, caused by damage to the brain, which results in an inability to understand words or sounds.

58. Audiological testing can determine the type of hearing loss from which a person suffers and whether a hearing aid will improve that person's hearing. Strathie's hearing loss is the conductive type.

59. Audiological testing evaluates two important hearing characteristics: (a) the ability to hear pure tones, i.e., the amount of sound heard; and (b) speech reception ability, i.e., the ability to understand and discriminate words.

60. The Pennsylvania Department of Transportation hearing regulation for school bus drivers requires only that an applicant for a Class 4 school bus drivers license be able to hear pure tones within a certain range without a hearing aid. 67 Pa.Code § 71.3b(5) (1979).

61. The use of a hearing aid can improve the hearing ability of some wearers both as to pure tone and as to speech discrimination. Audiological testing can identify which hearing aid wearers whose hearing will be improved in these respects.

62. The Division of Accident Analysis of the Department of Transportation collects and compiles traffic accident reports for the Commonwealth of Pennsylvania. The Director of the Bureau of Traffic Safety has never examined these reports to determine if any of the reported accidents involved

drivers with hearing aid or battery malfunction, hearing aid turn-off, hearing aid dislodgment, or noise amplification was a contributing factor to the accidents.

63. In addition to those reasons cited by the Medical Advisory Board as the basis for the hearing aid ban, the Pupil Transportation Division of the Department of Transportation has cited the fear that a school bus driver who wears a hearing aid might be unable to hear projectiles being thrown in the bus by students and that such a driver might be unable to hear the back door warning buzzer if it should sound. Despite these fears, however, the department has never conducted tests of the school bus interior or of hearing aid wearers to determine if such fears have any basis in fact.

64. Pennsylvania was the first state in the United States to allow persons with profound hearing loss to obtain automobile driver's licenses. Since that time, Pennsylvania has determined that the driving records of such persons are better than those of persons with normal hearing. This is so because hearing impaired persons attend more carefully to the process of driving and use their vision more extensively than do persons with normal hearing.

65. In a study conducted of drivers in the Washington, D. C. area over a three-year period, the accident rate for persons with normal hearing was more than triple that for hearing impaired persons, and the overall rate of traffic violations for persons with normal hearing was more than double that for hearing impaired persons. Schein, *Psychosocial Aspects of Deafness,* 1968.

66. In a nationwide survey conducted by the chairman of the First National Symposium on Deaf Drivers, statistics showed that hearing impaired drivers had only one-fourth as many accidents proportionately as drivers with normal hearing. Studies of deaf drivers in Colorado, Oregon, and Wisconsin revealed the same superior driving record of hearing impaired persons. Fine-silver, *The Driving Records of Deaf Drivers,* 1968.

67. The nationwide survey concluded that hearing impaired drivers are safe drivers for several reasons:

(a) Ninety-seven percent of all driving decisions are based on *visually* acquired information;

(b) Hearing impaired persons are generally conservative drivers who remain more alert and attentive to their driving than do drivers with normal hearing; excessive speed among hearing impaired drivers is uncommon;

(c) Hearing impaired drivers typically have a deep sense of communal responsibility in their driving activity; they recognize that their driving performance reflects on all other hearing impaired drivers as well.

## DISCUSSION

 Because the defendant officials of the Department of Transportation and the Department of Education are officers of the executive branch of government of the Commonwealth of Pennsylvania,[3] I must determine whether they are entitled to qualified immunity for acts performed in the course of official conduct. One policy consideration pervades the immunity analysis. Executive officials must be guided by the public interest in making decisions and authorizing actions of their subordinates. Implicit in the concept of a qualified immunity for certain official acts, is a recognition that officials may err. The rationale for the immunity protection is that unless an official is protected from personal liability he may refrain from decisionmaking, or be guided by factors other than the best interest of the public.

Although I recognize that in enacting section 1983, Congress intended to expose state officials to monetary liability under certain circumstances, the statute consistently has been construed as not working a

---

**3.** The Department of Transportation and the Department of Education are part of the Executive Department of the Commonwealth of Pennsylvania. Pa.Stat.Ann. tit. 71, § 61 (Purdon 1981).

**1376**

wholesale revocation of the common law immunity afforded government officials. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). In applying the qualified immunity to the acts of a state governor, a president of a state university, and officers and members of a state National Guard, the Court in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) declared:

> ■n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. *Scheuer, supra,* 416 U.S. at 247–248, 94 S.Ct. at 1692.

■ In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Court further refined the qualified immunity, stating it would be unavailable if the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [the person] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [the person]." *Wood, supra,* 420 U.S. at 332, 95 S.Ct. at 1001. Thus, under *Wood,* the im-

munity defense would be unavailable to defendants if the constitutional rights allegedly infringed by them were clearly established at the time of the challenged conduct, if they knew or should have known of the right in issue, or if they knew or should have known that their conduct violated the constitutional norm. *Wood, supra,* 420 U.S. at 321–325, 95 S.Ct. at 1000–1002.

■ As discussed in *Scheuer, supra,* if the scope of responsibility of the defendant officials does not require them to exercise some degree of discretion, the qualified immunity for executive officers is inapplicable.[4] A review of the Pennsylvania statutes reveals that the defendant officials held positions where they were required to exercise discretion and independent judgment in their decision making.[5] Therefore, I hold that the public positions occupied by the defendant officials are those to which the qualified immunity applies.

■ Having determined that the nature of defendant officials' positions warrants a qualified immunity, I must review the actions of defendants to determine whether their actions preclude application of the immunity. As stated above, these defendant state officials are not immune from section 1983 liability if they acted with a malicious intention to deprive plaintiff of his constitutional rights, or if they knew or should have known that their actions would violate clearly established constitutional rights. *Wood, supra,* 420 U.S. at 321–325, 95 S.Ct. at 1000–1002.

---

**4.** The justification for allowing a qualified immunity to shield certain public officials from liability under § 1983 lies in the nature of the official's position. *Wood, supra,* 420 U.S. at 318–22, 95 S.Ct. at 998–1000. In order for the official to act in the public interest, he must be able to exercise his judgment as a decision maker independently without the fear of the imposition of monetary liability for mistakes which were not unreasonable in light of all the circumstances existing at the time of the decision. If the public official does not exercise discretion in decision making there is no need for the qualified immunity. Therefore, public officials performing purely ministerial func-

tions are not entitled to qualified immunity for acts within the course of official conduct.

**5.** See 75 Pa.C.S.A. § 6103(a) (Purdon 1980); Pa.Stat.Ann. tit. 71, §§ 511, 512 (Purdon 1981) (delineating the responsibilities and duties of the Department of Transportation and authorizing the Secretary to promulgate rules and regulations in furtherance of and consistent with such duties and responsibilities). See Pa. Stat.Ann. tit. 71, §§ 248, 1037 (Purdon 1981) (same for Department of Education). See also Pa.Stat.Ann. tit. 71, § 511.4 (Purdon Pamphlet 1982) (Secretary of Education is member of State Transportation Advisory Committee).

There is no evidence on the record that the defendants acted in bad faith or out of ill will for the plaintiff or the class he represents in adopting or enforcing regulation 150. The Medical Advisory Board, established to recommend medical related regulations for adoption by the Department of Transportation, expressed its concern for the safety of the school children of the Commonwealth by suggesting that individuals wearing hearing aids not be permitted to drive school buses.[6] Following the board's recommendation, the Department of Transportation adopted regulation 150. Additionally, there is no evidence that the defendant officials of the Department of Education acted with malice or ill will towards the plaintiff or the class he represents in adopting the requirement that all school bus drivers meet driver competency requirements of the Department of Transportation. In fact the evidence shows that the only motivation for the recommendation, adoption, and enforcement of regulation 150, was concern for the safety of school children.

Relying on statistics to support a claim that the Department of Transportation acted arbitrarily in adopting regulation 150, plaintiff further argues the department and its Medical Advisory Board failed to consider the various types of hearing loss or the corrective results of hearing aids. Plaintiff's argument, however, misses the point because it does not address the board's stated reasons for adoption of regulation 150. For example, the corrective results of hearing aids are irrelevant to the issue that hearing aids may be subject to sudden mechanical failure. Although a hearing aid may magnify all sounds so that a person with impaired hearing will perceive all the sounds that come within the normal range of those whose hearing is not impaired, that corrective result is useless if the hearing aid is malfunctioning or its

power source has been depleted. Furthermore, that the federal safety standards for commercial truck drivers allow a driver to have a greater hearing loss than regulation 150 is irrelevant considering the "cargo" of school buses is the children of the Commonwealth. Additionally, plaintiff's statistics showing the superior driving records of deaf people does not address the responsibility of the school bus driver to control the children on the bus and deal with any and all emergencies that may arise. Indeed, plaintiff's medical data admits that even with use of a hearing aid, the wearer may be unable to localize sounds. The board considered this ability to be critical to the responsibilities of a school bus driver.

The plaintiff argues strenuously that because the Department of Transportation gave no consideration to implementing a system of individual hearing evaluations for applicants with hearing aids and yet routinely conducts such evaluations for school bus driver applicants suffering from other physical impairments, the department acted arbitrarily. Again, the concern expressed by the MAB in adopting regulation 150 cannot be addressed through a system of independent hearing evaluations. I know of no test, and none has been suggested, that would allow the Department of Transportation to determine whether a certain hearing aid will malfunction, whether the batteries will run down, or which applicants would be more likely to lower their hearing aid volume in noisy situations. Therefore, although plaintiff's statistical evidence is impressive, and even somewhat surprising, because it does not address the stated concerns of the Department of Transportation, in adopting regulation 150, it is unpersuasive.

A review of the reasons expressed by the defendants for adoption of regulation 150 reveals that the defendants believed the facts on which they were acting to be true

---

**6.** The Medical Advisory Board recommended the adoption of regulation 150 for numerous reasons including: the need for bus drivers to be able to localize sound, hearing aids are subject to mechanical breakdown, the volume control of a hearing aid can be turned down in noisy situations, hearing aid batteries may be defective or wear down with little or no warning, hearing aids can become dislodged from the ear, some types of hearing aids distort sound. See Findings of Fact 34–35.

and that there were reasonable grounds for their opinions. Thus, I find that plaintiff has not presented any evidence approaching the necessary quantum or qualify of proof of malice, ill will, arbitrariness, or anything else which points to bad faith.

There is no evidence on the record that the defendant officials engaged in conduct which violated the clearly established constitutional rights of the plaintiff or the class he represents. In fact, as I shall discuss below, the reasons expressed by the Medical Advisory Board in recommending adoption of the regulation by the Department of Transportation, provide a rational basis for the regulation sufficient to pass constitutional muster.

■ Initially I must note that no court in any jurisdiction has held a similar regulation invalid on any constitutional basis. The failure of the Department of Transportation, to review its regulations in accordance with federal regulations, however, warrants comment. As a recipient of federal funds, the Department of Transportation was required to conduct a self evaluation of its rules and regulations by May, 1978, to determine if they complied with the requirements of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1975). Although the Department never conducted this evaluation, nor developed any transition plan directed towards compliance with section 504 of the Rehabilitation Act, its failure to do so at most constitutes negligence, not a violation of plaintiff's constitutional rights. Plaintiff has not suggested otherwise. The appropriate remedy might be the cutting off of federal revenues. It would not be to restore plaintiff's license or award him damages.

I find that the defendant officials acted without malice and did not violate any clearly established constitutional right of the plaintiff. Therefore, the defendants are entitled to qualified immunity[7] and judgment must be rendered in their favor.

Having determined that the defendants are entitled to qualified immunity for their acts in adopting regulation 150, I go on to hold that even had I found the immunity inapplicable, I would still render judgment in favor of the defendants on the merits because regulation 150 is rationally related to a legitimate state purpose.

■ Because handicapped individuals do not make up a suspect classification, *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973), *Gurmankin v. Costanzo,* 411 F.Supp. 982 (E.D. Pa.1976), *aff'd,* 556 F.2d 184 (3d Cir. 1977), the constitutionality of the regulation must be evaluated by the rational relationship test. The Supreme Court has held numerous times that unless the plaintiff establishes that the regulation in question bears no rational relationship to a legitimate state purpose, the regulation will not be deemed unconstitutional. *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

When reviewing a classification under the rationality test, then, a court must conduct a two-step analysis. First, it should identify the purposes of the statute and assure itself that these purposes are legitimate; ordinarily, this inquiry will involve examinations of statements of purpose and other evidence in the legislative history. Second, having identi-

---

7. Recently, in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that the qualified immunity turns primarily on objective factors. *Harlow, supra,* —— U.S. at ——, 102 S.Ct. at 2738. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not·violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, supra,* —— U.S. at ——, 102 S.Ct. at 2738. That formula-

tion of the qualified immunity, though different than the test applied here, does not change my decision affording the individual defendants immunity. First, I applied the old test because the conduct complained of in this case occurred prior to *Harlow, supra.* I will not apply *Harlow, supra,* retroactively. Second, the qualified immunity applies here even using the more stringent test of *Scheuer, supra,* and *Wood, supra.* Therefore, application of the *Harlow, supra,* test could not affect my finding.

fied the governmental purposes, the court must determine whether the classification is rationally related to the achievement of these goals.

*Delaware River Basin Commission v. Bucks County Water & Sewer Authority,* 641 F.2d 1087, 1092–93 (3d Cir. 1981) (footnotes omitted). As part of its analysis, "a court must determine if the provision rationally furthers *any* legitimate state objective." *Hopkins v. Kelsey-Hayes, Inc.,* 628 F.2d 801, 809 (3d Cir. 1980), *vacated and remanded on other grounds sub nom. G. D. Searle & Co. v. Cohn,* —— U.S. ——, 102 S.Ct. 1137, 71 L.Ed.2d 250 (1982), quoting *Malmed v. Thornburgh,* 621 F.2d 565, 569 (3d Cir.), *cert. denied,* 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed. 219 (1980). (emphasis in original). Moreover, the party "challenging the constitutionality of the . . . [regulation] ha[s] the . . . burden of demonstrating that the . . . [regulation] cannot 'rationally further[ ] *any* legitimate state objective.' " *Id.*

The record indicates that the primary concern of the Department of Transportation and Department of Education was protecting the health, safety, and welfare of the school children entrusted to their custody. This is clearly a legitimate state purpose. The regulation prohibiting the use of hearing aids by school bus drivers is rationally related to the objectives of licensing only the most qualified persons for driving and child care. The record reveals that the Department of Transportation's Medical Advisory Board voiced many concerns relevant to selecting the most competent persons for driving and child care in recommending the adoption of the challenged regulation, including the following:

1. The ability to hear at a certain level and determine the source and location of sounds is necessary for driving safety.

2. The ability to hear at a certain level and localize sound is necessary to handle promptly and properly emergency or discipline situations that might occur on a school bus.

3. A hearing aid is a mechanical device subject to unpredictable breakdowns.

4. A hearing aid runs on batteries which periodically run down, giving the wearer a gradual diminution in volume as the only warning of battery failure.

5. A hearing aid can be dislodged by accident from the ear.

6. In response to noisy school children a bus driver might lower the volume control on his hearing aid.

▮▮▮▮ Plaintiff's statistical evidence does not show that regulation 150 had no rational relationship to the legitimate state objective. As stated above, his evidence fails to address the concerns expressed by the MAB in recommending the adoption of the regulation by the Department of Transportation. See pp. 1377 to 1378 supra. Clearly, the regulation is rationally related to a legitimate state purpose and therefore it does not violate the due process or equal protection clauses of the Fourteenth Amendment.[8]

As a federal court reviewing a state constitutional provision under the equal protection and [due process] clause[s], we may not demand perfection, or "mathematical nicety." All we can do is determine whether the provision is rationally related to achieving a legitimate state objective. . . . So long as a rational basis can be identified, and we can identify several here, our task is at an end.

8. Plaintiff's claim pursuant to section 618(a)(1) of the Vehicle Code of Pennsylvania, Pa.Stat. Ann. tit. 75, § 618(a)(1) (Purdon 1979) (repealed), has no merit. Section 618 states in pertinent part:

The secretary may suspend the operating privileges of any person, with or without a hearing before the secretary of his representative, . . . whenever the secretary finds upon sufficient evidence:

(1) That such person is incompetent to operate a motor vehicle . . . , or is afflicted with mental or physical infirmities or disabilities rendering it unsafe for such person to operate a motor vehicle . . . upon the highways. Having found in my constitutional analysis that the secretary did not act arbitrarily, in bad faith, or out of ill will for plaintiff or the class he represents, and the regulation was enacted to promote the safety of school bus riders, I conclude there was no violation of section 618.

*Malmed v. Thornburgh, supra,* 621 F.2d at 573 (citations omitted).

 Notwithstanding that I have found regulation 150 constitutional, I must determine whether the regulation discriminates against plaintiff and the class he represents in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[9] *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372, 1383 (10th Cir. 1981). Section 504 states in pertinent part:

> No otherwise qualified handicapped individual in the United States, . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

First, it is undisputed that both the Department of Transportation and Department of Education receive federal financial assistance. See Findings of Fact 8, 10, and 13. Second, plaintiff and the class he represents are handicapped individuals within the meaning of section 504.[10] Therefore, plaintiff is entitled to the protections provided by section 504.

 An "otherwise qualified" person is one who is able to meet all employment requirements, including necessary physical qualifications, despite his handicap.[11] *Southeastern Community College v. Davis,* 442 U.S. 397, 406–07, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *American Public Transit Association v. Lewis,* 655 F.2d 1272, 1277 (D.C.Cir.1981). In other words, mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Southeastern Community College v. Davis, supra,* 442 U.S. at 405, 99 S.Ct. at 2366.

 Citing empirical studies noting the superior driving abilities of persons with hearing impairments, plaintiff contends that by prohibiting *all* hearing impaired persons from driving school buses, whether the deficiency is corrected by a hearing aid or not, regulation 150 discriminates against him and the class he represents in violation of section 504. Stated in terms of section 504, plaintiff asserts he is a competent driver, qualifies for a class 4 license, and therefore, is an "otherwise qualified" person excluded from a bus driver position solely by reason of his handicap. I disagree.

On a noisy bus, a hearing aid wearer might not hear or be able to distinguish the source of sound that would cause danger because sound comes from 360 degrees around him. If a person with impaired

---

**9.** "[W]hile application of the rational basis test may be used to lend credence to the proposition that no discriminatory action has been taken, a finding of rational behavior . . . is only the start of . . . [my] search to determine whether the mandate of § 504 has been followed." *Pushkin v. Regents of the University of Colorado, supra,* 658 F.2d at 1383.

**10.** The statute defines "handicapped individual" as follows:

(7)(A) Except as otherwise provided in subparagraph (B), the term "handicapped individual" means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter.

(B) Subject to the second sentence of this paragraph, the term "handicapped individual" means for purposes of subchapters IV and V of this chapter, any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. For purposes of section 793 and 794 of this title as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.
29 U.S.C. § 706(7) (1982).

**11.** Recently, the United States Court of Appeals for the Third Circuit held that section 504's prohibition against discrimination by federal grantees encompasses a ban against employment discrimination. *LeStrange v. Consolidated Rail Corporation,* 687 F.2d 767 (3d Cir. 1982).

hearing wears a hearing aid in only one ear, the right ear for example, all sounds will be presented to that ear whether they emanate from the right, left, ahead, or behind. If the microphone for the device is located at any spot other than in the ear, the deaf person will be misled as to the direction from which the sound is coming. It would seem only stereo hearing aids could hope to overcome this problem.[12] Although that type of hearing aid undoubtedly enables the wearer to localize sounds better than other types, the wearer still may not be able to distinguish the direction from which sound comes as well as a person with normal hearing. Cole deposition at 24. Even with microphones in both ears, the problems of sudden mechanical failure, dislodgment, or hearing aid turn-off in noisy environments still exist. It must be remembered that a hearing aid does not enable a person with a hearing deficiency to hear as if he had no deficiency. The hearing aid merely amplifies within its inherent tonal capacities all sound to a level that the wearer can hear it. The problem shared by people with hearing aids is that in a crowd they hear only a roar of undifferentiated, undecipherable sound—i.e., the magnified sum total of some of what is going on in the vicinity with little or no way to distinguish near from far, tone from tone, or important from trivial. The deaf person may have a cacophonous hubbub or a gentle murmur depending upon how he sets his volume control. In either, the cries of a child or the blare of a horn may be lost. It was this inability to deal with noise that concerned the Department of Transportation. Operating from a concern for the safety of school bus riders, the Department of Transportation adopted regulation 150. Reports from hearings prior to and after enactment state that to be qualified to drive a school bus, an individual not only must be able to drive with great skill and care, he must be able to control the children on the bus and deal with any and all emergencies that may arise. Because even by use of a hearing aid, the wearer may be unable to localize sounds or distinguish particular sounds, a person with a hearing deficiency cannot perform at least two necessary functions of a school bus driver: provide control over and safety to the riders. Additionally, the deficiencies of hearing aids, being subject to turn-off and mechanical failure, might adversely affect a hearing aid wearer's ability to drive a school bus safely. Therefore, plaintiff and the class he represents are not "otherwise qualified" individuals within the meaning of the Rehabilitation Act. Accordingly, regulation 150 does not discriminate against plaintiff in violation of section 504.[13]

This case is similar to *Southeastern Community College v. Davis, supra,* 442 U.S. at 414, 99 S.Ct. at 2371, which held that exclusion from a nursing program of a person with a hearing deficiency did not violate section 504. There, an audiologist testified that although with a hearing aid plaintiff could hear gross sounds in the listening environment, she could not understand speech except when she could look at the person talking and read lips. In light of

---

12. Strathie wears a hearing aid with microphones in both ears. But this too may cause confusion. If the volume control for one ear is higher than its companion, sound will seem to come from the side with the higher volume even though it may actually come from the other.

13. Because I have found that plaintiff cannot prevail on his claim of discrimination under section 504, he similarly cannot prevail on his claim of discrimination under the Pennsylvania Human Relations Act, Pa.Stat.Ann. tit. 43, § 955 (Purdon Pamphlet 1982). The Pennsylvania Human Relations Act does not bar[ ] unequal treatment on the basis of a *job-related* handicap, ... or one which does interfere with

the ability to perform essential functions of the job. In Section 955 of the Pennsylvania Human Relations Act as amended, 43 P.S. § 955, it is specified that the section's anti-discrimination provisions "shall not be construed to prohibit the refusal to hire or the dismissal of a person who is not able to function properly in the job applied for or engaged in."

*Laws v. Commonwealth of Pennsylvania, Philadelphia County Board of Assistance, Department of Public Welfare,* 50 Pa.Cmwlth. 340, 412 A.2d 1377, 1380 (1980) (emphasis in original).

As demonstrated above, plaintiff's handicap is clearly job-related. Thus his claim under state law has no merit.

that testimony, the district court found that there were many medical situations where plaintiff's handicap would make it unsafe for her to try to render patient care.[14] 424 F.Supp. 1341 (E.D.N.C.1976). Here, although plaintiff undoubtedly can perform many tasks required of a school bus driver, situations might arise in which his handicap would prevent him from performing the position adequately. Moreover, those situations, where a rider may be in need of medical attention, or may be endangering the safety of other riders or drivers, are of the type which highlight the need for a school bus driver who can react promptly and appropriately. Given the limitations, uncertainties, and deficiencies of hearing aids, plaintiff and the class he represents may not be able to perform adequately as school bus drivers, and thus, I cannot find they are "otherwise qualified" individuals within the meaning of the Rehabilitation Act.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the persons and subject matter. 28 U.S.C. §§ 1331, 1343 (1981).

2. The defendant officials occupy positions in the executive branch of government of the Commonwealth in which they are required to exercise considerable discretion and independent judgment in decision-making. 75 Pa.C.S.A. § 6103(a) (Purdon 1980); Pa.Stat.Ann. tit. 71, §§ 511, 512 (Purdon 1981). Their positions are those to which a qualified immunity applies under certain circumstances for acts performed in the course of official conduct. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

3. There is no evidence that the defendants exercised bad faith or acted with malicious intent towards plaintiff or the plaintiff class.

4. There is no evidence that the defendants violated the clearly established constitutional rights of plaintiff or the plaintiff class.

5. At all times relevant to this matter, the defendants acted in the course of official conduct.

6. The defendants are entitled to qualified immunity for acts as regards the plaintiff.

7. There is a rational basis and a legitimate state purpose in the adoption and enforcement of the regulation not permitting hearing aid wearers to drive school buses, and therefore, Pennsylvania Department of Transportation Regulation 150 is not unconstitutional.

8. Plaintiff and the class he represents are not "otherwise qualified" individuals within the meaning of the Rehabilitation Act of 1973.

9. Regulation 150 does not discriminate against plaintiff and the class he represents in violation of section 504 of the Rehabilitation Act of 1973.

10. Because plaintiff's handicap is job-related, regulation 150 does not violate the Pennsylvania Human Relations Act.

11. Because, in adopting regulation 150, the secretary of transportation did not act arbitrarily, in bad faith, or out of ill will for plaintiff, and rather, sought to promote the safety of school bus riders, there was no violation of Pa.Stat.Ann. tit. 75 § 618(a)(1) (Purdon 1979) repealed and recodified, 75 Pa.C.S.A. §§ 1532, 1533 (Purdon 1982).

12. Judgment will be entered in favor of the defendants.

---

14. The court of appeals affirmed in part and reversed in part stating that the college had a duty under the rehabilitation act to undertake affirmative action to adapt its educational program to plaintiff's particular needs. 574 F.2d 1158 (4th Cir. 1978). The Supreme Court disagreed. Therefore, the finding of the district court was not an issue on appeal.