Commonwealth of Pennsylvania, Department of Transportation, Bureau of Traffic Safety, Appellant *v.* Sara Marie Liberati, Appellee.

Argued March 3, 1983, before President Judge CRUMLISH, JR. and Judges WILLIAMS, JR. and BARBIERI, sitting as a panel of three.

*Robert S. Englesberg,* Deputy Attorney General, with him *LeRoy S. Zimmerman,* Attorney General, for appellant.

*A. Patricia Diulus, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, P.C.,* with her *Jon Pushinsky,* for appellee.

Opinion by Judge Williams, Jr., February 29, 1984:

In this case, the Pennsylvania Department of Transportation, Bureau of Traffic Safety (Bureau), urges us to reverse an order of the Court of Common Pleas of Allegheny County restoring the driver's license of Sara Marie Liberati, the appellee herein. The Bureau had recalled Mrs. Liberati's license, after concluding that she suffered from a visual condition which was incompatible with the safe operation of a motor vehicle.

Mrs. Liberati first received a driver's license about 1965, when she was sixteen years old. Six years later, in 1971, she developed an eye condition that diminished her central visual acuity. Acting on a doctor's advice, she ceased driving for several years; however, she continued to renew her driver's license. Liberati subsequently became aware of bioptic telescopic lenses, which, it seems, had been developed by a Dr. William Feinbloom, a New York optometrist. These lenses were said to have been designed to aid people suffering from poor visual acuity.

Mrs. Liberati contacted Dr. Feinbloom, and went to New York to be fitted for a pair of his bioptic tele-

scopic lenses. Following a period of adjustment and training with the lenses, she resumed driving. However, in November 1979, she received from the Bureau a notice to have her optometrist or ophthalmologist submit a certification of her visual efficiency. Liberati's optometrist, Dr. Paul B. Freeman, certified that without a corrective device her visual acuity was 20/200 in the right eye, 20/300 in the left eye, and 20/300 for both eyes. The optometrist also certified that, *with correction,* Liberati's visual acuity was 20/40 in the right eye, 20/30 in the left eye, and 20/25 for both eyes. Dr. Freeman further stated that Mrs. Liberati's telescopic lenses improved her visual performance, and would enable her to safely operate a motor vehicle.

On December 10, 1979, the Bureau sent Mrs. Liberati a notice stating that her driver's license was being recalled. The Bureau advised Liberati that her visual condition, as indicated by the visual-examination report, did not meet the Bureau's standards of visual efficiency and was not compatible with the safe driving of a vehicle.

The Bureau's recall decision was made pursuant to a regulation formerly referred to as 67 Pa. Code §157.3, which set forth the visual standards for driving. For example, subsection (b) of the regulation provided that: ''A person with less visual acuity than 20/40 combined vision shall wear lenses correcting his/her vision to 20/40 or better while driving.'' Of particular significance to the instant case was 67 Pa. Code §157.3(e), which stated that: *''Correction through the use of telescopic lenses is not acceptable for purposes of meeting acuity requirements.''* (Emphasis added). All of the above provisions are now found under 67 Pa. Code §83.3.

In response to the Bureau's recall notice, Mrs. Liberati took an appeal to the Court of Common Pleas

of Allegheny County. In that appeal she challenged the regulatory prohibition against the use of telescopic lenses. Specifically, Liberati asserted the following: (1) that the prohibition against telescopic lenses discriminates against the handicapped, and thus violates Section 504 of the federal Rehabilitation Act of 1973; (2) that the prohibition denies equal protection of the law, and thus offends the federal and state constitutions; and (3) that the prohibition creates an irrebuttable presumption which violates both the equal protection and due process clauses of the federal and state constitutions.

In her case before the trial court, Mrs. Liberati presented several witnesses who vouched for her practical ability to drive safely while wearing her telescopic lenses. She also presented Drs. Freeman and Feinbloom as expert witnesses. Dr. Freeman reaffirmed his previous opinion that Liberati, by virtue of the visual correction achieved with her telescopic lenses, was able to safely operate a motor vehicle. Dr. Feinbloom described the nature of telescopic lenses, and how they can improve a person's visual efficiency as to permit the safe operation of a motor vehicle. The Bureau presented expert witnesses of its own, who contradicted Liberati's evidence as to the efficacy of the lenses.

On May 24, 1982, the trial court issued an order sustaining Liberati's appeal, and directing the Bureau to restore her driver's license. In so ordering, the court concluded that the regulatory prohibition against the use of telescopic lenses violated Section 504 of the federal Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. §794. The court did not address Liberati's constitutional claims.

Before considering the issues presented by the instant appeal, we shall first identify the legal sources of the prohibition against telescopic lenses. Section

1504(c) of the Vehicle Code, 75 Pa. C. S. §1504(c), requires the state Department of Transportation (Department) to establish by regulation the qualifications necessary for the safe operation of vehicles. Section 1517 of the Vehicle Code, 75 Pa. C. S. §1517, establishes a thirteen-member Medical Advisory Board (MAB); and gives the MAB the duty of formulating rules and regulations, for adoption by the Department, on physical and mental criteria including vision standards relating to the licensing of drivers. 75 Pa. C. S. §1517(a), (b). Among the members of the MAB are eight medical professionals, including one ophthalmologist and one optometrist. 75 Pa. C. S. §1517(a). The visual standards in 67 Pa. Code §157.3 (now 67 Pa. Code §83.3), including the proscription of telescopic lenses, represent the Department's regulatory adoption of the MAB's vision criteria.

The MAB's reason for rejecting telescopic lenses as an acceptable vision-correction device was described to the trial court by two Commonwealth witnesses, Dr. Robert A. Winstanley and Dr. Arthur H. Keeney. Both of these witnesses are experts in the field of ophthmology, and were previous members of the MAB.

Dr. Winstanley had been the MAB's ophthalmologist member when that body took a position against the use of telescopic lenses. According to Winstanley's testimony, the primary reason for the rejection of telescopic lenses was the fact that they create a relatively large scotoma or "blind spot" around the central field of vision during their use, and that such renders the device unsafe for use while driving. Dr. Keeney stated that telescopic lenses had also been discussed and considered during his membership on the MAB, and that they were found to present serious visual disadvantages which make them unsuitable for safe driving. In addition to describing

the "blind spot" that attends the use of the lenses, Keeney stated that the lenses cause objects to appear nearer than they actually are, and that the device makes it difficult to see things above head level. He further testified that, based on his studies and experiments with telescopic lenses, it is dangerous to use them for driving purposes.

As noted, the trial court determined that the regulatory prohibition against telescopic lenses violates Section 504 of the Rehabilitation Act. Section 504 provides in part as follows:

> No otherwise qualified handicapped individual . . . , shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

The trial court found that Mrs. Liberati is an "otherwise qualified handicapped individual" within the meaning of Section 504 of the Rehabilitation Act. In that regard, the court reasoned that Liberati, despite her vision impairment, could meet all driving requirements by the use of the telescopic lenses. The court also found that the scotoma or blind spot, described by Drs. Winstanley and Keeney, would not render Liberati unable to drive safely; and that the other problems imputed by those witnesses to telescopic lenses could be compensated for by shifting head-movements or by training. In sum, the court decided that the ban against telescopic lenses constituted unlawful discrimination against a handicapped person insofar as Mrs. Liberati is concerned.

It is undisputed that Mrs. Liberati, because of her serious vision impairment, is a handicapped person within the meaning of Section 504 of the Rehabilitation Act. However, for a handicapped person to successfully invoke the anti-discrimination mandate of

Section 504, the person must, as the trial court recognized, be "otherwise qualified" for the program or activity from which he or she has been excluded. To be an "otherwise qualified handicapped individual" under Section 504, the person must be able, *in spite of his or her particular handicap,* to meet the requirements of the program or activity in question. *Southeastern Community College v. Davis,* 442 U.S., 397 (1979).

The activity in which Mrs. Liberati seeks to participate, and from which she has been excluded, is the driving of an automobile on the public highways. There can be no doubt that her vision, without the aid of an efficacious corrective device, would make it highly dangerous for her to drive a motor vehicle. Therefore, if she is to be deemed "otherwise qualified" to drive a vehicle, the vision-correcting device upon which she relies must be one that is compatible with driving safety. Thus, the crucial factual question overhanging this case is whether telescopic lenses, as a vision-aiding device, meet that requirement.

Pursuant to its grant of legislative power, the MAB determined that telescopic lenses produce particular effects which make them unsafe for use in the driving of a motor vehicle. That conclusion, as the record of this case indicates, was not based on mere assumption, but reflected the studied judgment of experts in the fields of ophthalmology and optometry. Merely because there is other expert opinion to the contrary does not negate the validity of the MAB's conclusion about telescopic lenses.

In the instant case, the trial court rejected the MAB's determinations regarding telescopic lenses; and did so based on the contrary opinions of Mrs. Liberati's witnesses. For the trial court to render such a decision amounted, in our view, to the court improperly assuming a specialized fact-finding func-

tion which the state legislature implicitly assigned to the MAB. Since we conclude that the trial court erred in rejecting the MAB's determinations about telescopic lenses, we must hold that Mrs. Liberati's use of the lenses as a vision-aiding device could not make her "otherwise qualified" to drive an automobile on the public highways. Hence, her claim under Section 504 of the Rehabilitation Act must fail. See *Strathie v. Department of Transportation,* 547 F. Supp. 1367 (E.D. Pa. 1982) (regulation against use of hearing aids to meet hearing requirements for school-bus drivers, held not discriminatory under Section 504 of Rehabilitation Act).

Because we have decided against Mrs. Liberati's claim under the Rehabilitation Act, it becomes necessary for us to decide the constitutional challenges she raised below but which were not reached by the trial court. As noted, she asserted in the proceedings below that the prohibition against telescopic lenses violates the equal protection and due process provisions of both the federal and state constitutions. In her equal-protection challenge, Liberati seems to argue that the regulatory proscription of telescopic lenses results in the unequal treatment of certain handicapped people, and represents a constitutionally invalid legislative classification. This challenge must fail.

Under equal-protection principles, legislative differentiations based on physical disability are not "suspect classifications." *Frontiero v. Richardson,* 411 U.S. 677, 686 (1973); *Strathie,* 547 F. Supp. at 1378. Therefore, the regulation here in issue cannot be held to violate the equal protection clause of the federal constitution if any state of facts reasonably may be conceived to justify the regulation. *Richardson v. Belcher,* 404 U.S. 78 (1971); *Dandridge v. Williams,* 397 U.S. 471 (1970). Under our state constitution,

essentially the same principles apply. *Springfield School District v. Department of Education,* 483 Pa. 539, 397 A.2d 1154 (1979). As we perceive the matter before us, the regulatory ban against telescopic lenses rests on a rational factual basis. And, since the regulation is clearly concerned with driving safety, the legitimate state interest promoted thereby is self-evident.

In her other constitutional argument, Mrs. Liberati asserts that 67 Pa. Code §157.3(e) created an "irrebuttable presumption" that a person cannot drive safely with telescopic lenses, and that the regulatory ban thus violates constitutional due process. Given what we have already said about the rational basis for the regulation, the due process challenge is without merit. *See Malmed v. Thornburgh,* 621 F.2d 565 (3d Cir. 1980).

For the reasons set forth in this opinion, the order of the court below must be reversed.

### ORDER

AND Now, the 29th day of February, 1984, the order of the Court of Common Pleas of Allegheny County dated May 24, 1982, at No. SA 28 of 1980, is hereby reversed.